Nos. 24-10287-DD & 24-10440-D

# In the United States Court of Appeals for the Eleventh Circuit

AMERICAN SOUTHERN HOMES HOLDINGS,
LLC, ET AL.,
*Plaintiffs–Appellants,*

v.

DAVID ERICKSON, ET AL.,
*Defendants–Appellees.*

On Appeal from the United States District Court
for the Middle District of Georgia
No. 4:21-cv-00095-CDL

## OPENING BRIEF OF APPELLANTS AMERICAN SOUTHERN HOMES HOLDINGS, LLC AND ASH-GRAYHAWK, LLC

Jacob A. Kramer
jake.kramer@faegredrinker.com
FAEGRE DRINKER BIDDLE &
REATH, LLP
1500 K Street NW
Suite 1100
Washington, D.C. 20005
Tel.: (202) 230-5289
Fax: (202) 842-8465

April 3, 2024

Ed R. Haden
ehaden@balch.com
James A. Bradford
jbradford@balch.com
BALCH & BINGHAM LLP
1901 Sixth Ave. North
Suite 1500
Birmingham, AL 35203
Tel.: (205) 226-8795
Fax: (205) 226-8799

Nos. 24-10287-DD & 24-10440-D

*American Southern Homes Holdings, LLC, et al. v. Erickson, et al.*

## CERTIFICATE OF INTERESTED PERSONS

Plaintiffs-Appellants American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC submit this Certificate of Interested Persons and Corporate Disclosure Statement. *See* Fed. R. App. P. 26.1; 11th Cir. R. 26.1-1, -2, & -3. The following parties and non-parties "have an interest in the outcome of the particular case or appeal":

**Agnew, Alison,** counsel for plaintiffs-appellants;

**American Southern Homes, LLC,** parent entity of ASH-Grayhawk, LLC;

**American Southern Homes Holdings, LLC,** plaintiff-appellant and parent entity of American Southern Homes, LLC;

**ASH-Grayhawk, LLC,** plaintiff-appellant;

**Balch & Bingham, LLP,** law firm of counsel for plaintiffs-appellants American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC;

**Beck, Rachel Anna**, counsel for plaintiffs-appellants;

**Bradford, James A.**, counsel on appeal for plaintiffs-appellants;

**Buchanan, Jerry A.**, counsel for plaintiffs-appellants;

**Carrollton Development LLC**, defendant-appellee;

**Cusseta Road, LLC**, defendant-appellee;

**Demm, Stephen P.**, counsel for defendants-appellees;

**Dumbacher, Robert T.**, counsel for defendants-appellees;

C-1 of 3

Nos. 24-10287-DD & 24-10440-D

*American Southern Homes Holdings, LLC, et al. v. Erickson, et al.*

**Elliker, Kevin S.**, counsel for defendants-appellees;

**Erickson, David B.**, defendant-appellee;

**Erickson Investments Inc.**, defendant-appellee;

**Erickson, Rose Anne**, defendant-appellee;

**Faegre Drinker Biddle & Reath, LLP**, law firm that acted as counsel for plaintiffs-appellants;

**GH Lot Holdings Inc.**, defendant-appellee;

**GH Lot Holdings of Atlanta, Corp.**, defendant-appellee;

**GH Lot Holdings of South Carolina, Inc., f/k/a Grayhawk Homes of South Carolina, Inc.**, defendant-appellee;

**Grey Rock Development LLC**, defendant-appellee;

**Haden, Ed R.**, lead counsel on appeal for plaintiffs-appellants;

**Harris, David A.**, counsel for NGM Insurance Company;

**Horwood, Drew M.**, counsel for plaintiffs-appellants;

**Hunton Andrews Kurth LLP**, law firm acting as counsel for defendants-appellees;

**Kramer, Jacob Anthony**, counsel for plaintiffs-appellants;

**Land, Judge Clay D.**, U.S. District Court Judge;

**Lin, Elbert**, lead counsel on appeal for defendants-appellees, cross-appellants;

**Lomax, Robert R.**, counsel for defendants-appellees;

**Maziarz, Jessica R.**, counsel for plaintiffs-appellants;

Nos. 24-10287-DD & 24-10440-D
*American Southern Homes Holdings, LLC, et al. v. Erickson, et al.*

**Merritt, David R.**, counsel for plaintiffs-appellants;

**NGM Insurance Company**, surety for injunction bond for plaintiffs-appellants American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC;

**Peterson, Joshua Todd**, counsel for plaintiffs-appellants;

**Quackenboss, Robert T.**, counsel for defendants-appellees;

**Sage Development, Inc.**, defendant-appellee;

**Schronce, Johnathon E.**, counsel for defendants-appellees;

**Shebelskie, Michael R.**, counsel for defendants-appellees;

**Tiger Creek Development, Inc.**, defendant-appellee; and

**Windsong Bonacre, LLC**, defendant-appellee.


**<u>Statement Regarding Publicly Traded Companies</u>**

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Ed R. Haden*
Ed R. Haden
One of the Attorneys for Plaintiffs-Appellants American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC

# STATEMENT REGARDING ORAL ARGUMENT

While the issues are straightforward, the record in this appeal is extensive.   American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC request oral argument to aid the Court in making its decision.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................... C-1

Statement Regarding Oral Argument ........................................................ i

Table of Citations ...................................................................................... iv

Statement of Subject-Matter  and Appellate Jurisdiction ..................... vii

Statement of the Issue ................................................................................ 1

I.    Whether the District Court erred in denying ASH's motion for judgment as a matter of law on Erickson's defense that ASH prevented him from agreeing to a Phase C lot development order and/or delivering such lots. ............................................................. 1

Statement of the Case ................................................................................. 2

Summary of Argument ............................................................................... 47

Argument ..................................................................................................... 50

I.    The District Court Erred In Denying ASH's JML Motion On The Prevention Defense Because Negotiations And  A Lis Pendens Notice That This Lawsuit Existed Did Not Make It Impossible for Erickson To Perform Under The Land Purchase Agreement. ............................................................................... 50

    A.    To Prevent One Party from Performing a Contract, Georgia Law Requires that the Other Party Make Performance "Impossible." ........................................................ 53

    B.    ASH's Settlement Negotiations and Lis Pendens Notice Did Not Make Erickson's Agreement to a Phase C Lot Development Order and/or Delivery Lots Impossible. .......... 56

        1.    Negotiations: ASH's Seeking an Agreement with Erickson on All Disputed Claims Did Not Make Erickson's Performance "Impossible." ............................. 56

        2.    Lis Pendens: ASH's Failure to Respond to Erickson's Eve-of-Trial Request to Lift the Lis Pendens on 40 Phase C Lots did Not make Erickson's Performance "Impossible." .............................................. 61

C.    ASH Preserved its JML Arguments on Prevention Because the District Court and Erickson were Aware of those Arguments when ASH made them in its Pre-Trial JML Motion. .......................................................................... 69

Conclusion ......................................................................................... 78

Certificate of Compliance .................................................................. 80

iii

# TABLE OF CITATIONS

## CASES

*Aiken v. Citizens & Southern Bank of Cobb County,*
    291 S.E. 2d 717 (Ga. 1982) .................................................................. 63

*Allen v. Harkness Stone Co., Inc.,*
    609 S.E.2d 647 (Ga. Ct. App. 2004) ..................................................... 68

*Batson v. Etheridge,*
    195 So. 873 (Ala. 1940) ........................................................................ 63

*CRS Sirrine, Inc. v. Dravo Corp.,*
    464 S.E.2d 897 (Ga. App. Ct. 1995) ..................................................... 54

*Dime Sav. Bank of New York, FSB v. Sandy Springs Assoc., Inc.,*
    405 S.E.2d 491 (Ga. 1991) .................................................................... 63

*Etienne v. Inter–Cnty Sec. Corp.,*
    173 F.3d 1372 (11th Cir. 1999) ............................................................ 71

*Highland Consulting Group, Inc. v. Minjares,*
    74 F.4th 1352 (11th Cir. 2023) ............................................................ 47

*Howard v. Walgreen Co.,*
    605 F.3d 1239 (11th Cir. 2010) ............................................................ 76

*Huntington v. Fishman,*
    441 S.E.2d 444 (1994) .......................................................................... 57

*Hutson v. Young,*
    564 S.E.2d 780 (Ga. Ct. App. 2002) ..................................................... 62

*\*Insurance Company of the West v. Island Dream Homes, Inc.,*
    679 F.3d 1295 (11th Cir. 2012) ............................................... 70, 71, 76

*J & E Builders, Inc. v. R C Dev., Inc.,*
    646 S.E.2d 299 (Ga. Ct. App. 2007) ..................................................... 53

*L.D.F. Family Farm, Inc. v. Charterbank,*
    756 S.E.2d 593 (2014) .................................................................... 55, 65

*Lankford v. Milhollin,*
    48 S.E.2d 729 (Ga. 1948) ...................................................................... 62

iv

*Moody Nat'l RI Atlanta H, LLC v. RLJ III Fin. Atlanta, LLC,*
    No. 1:09–cv–3676–WSD, 2010 WL 163296
    (N.D.Ga. Jan. 14, 2010) ........................................... 55, 57, 58, 59, 60

*Nat'l Indus., Inc. v. Sharon Steel Corp.,*
    781 F.2d 1545 (11th Cir. 1986) ........................................................77

*Ott v. Vineville Mkt. Ltd.,*
    416 S.E. 2d 362 (Ga. Ct. App. 1992) ....................................54, 64, 67

*Quinn v. Southwest Wood Prods., Inc.,*
    597 F.2d 1018 (5th Cir. 1979) ..........................................................72

*Raburn Bonding Co. v. State,*
    535 S.E.2d 763 (Ga. Ct. App. 2000) .................................................68

*Rankin v. Evans,*
    133 F.3d 1425 (11th Cir. 1998) ........................................................70

*Roberson v. Eichholz,*
    462 S.E.2d 382 (Ga. Ct. App. 1995) .................................................68

*Ross v. Rhodes Furn., Inc.,*
    146 F.3d 1286 (11th Cir. 1998) ........................................................77

*Rourk v. Bank of American National Association,*
    587 Fed. Appx. 597 (11th Cir. 2014).................... 54, 55, 56, 57, 65, 67

*Sanchez v. Disc. Rock & Sand, Inc.,*
    84 F.4th 1283 (11th Cir. 2023) ..........................................................xi

*Sparks v. Sunshine Mills, Inc.,*
    580 Fed.Appx. 759 (11th Cir. 2014)...................................................57

*Weathercraft Co. v. Byrd,*
    123 S.E. 180 (Ga. Ct. App. 1924) .....................................................69

**STATUTES**

15 U.S.C. § 1121 ...............................................................................viii

15 U.S.C. § 1125(a) .............................................................................ix

28 U.S.C. § 1291 ...................................................................................x

28 U.S.C. § 1331 ...............................................................................viii

28 U.S.C. § 1338 ................................................................viii

28 U.S.C. § 1367 ..................................................................ix

28 U.S.C. § 2107 .................................................................xii

Ga. Code Ann. § 13-4-23.......................................... 53, 54, 67

## RULES

Fed. R. App. P. 26.1 ..............................................................1

Fed. R. App. P. 28..................................................ix, x, xi, xii

Fed. R. App. P. 4..................................................................xii

Fed. R. Civ. P. 50........................... xi, xii, 12, 70, 71, 73, 76, 77

Fed. R. Civ. P. 54................................................................13

Fed. R. Civ. P. 59...................................................xi, xii, 13, 44

Fed. R. Civ. P. 60................................................................13

Fed. R. Civ. P. 61................................................................53

11th Cir. R. 26.1-1 .................................................................1

11th Cir. R. 26.1-2 .................................................................1

11th Cir. R. 26.1-3 .................................................................1

11th Cir. Rule 28-1 ................................................ix, x, xi, xii

11th Cir. Rule 28-5 .............................................................viii

*Cases the Appellants rely upon.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The District Court had subject-matter jurisdiction over the claims filed by American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC (collectively, "ASH") for federal trademark and copyright violations and federal unfair competition as federal questions and as claims related to copyrights and trademarks. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to ... copyrights and trademarks."); 15 U.S.C. § 1121(a) ("The district and territorial courts of the United States shall have original jurisdiction ... of all actions arising under this chapter ...."); Doc.1(Compl.)-Pgs.48-49[1] (Count Five—copyright infringement); Doc.71(Sec. Am. Compl.)-Pgs.56-57 (Count Five—copyright infringement); Doc.1(Compl.)-Pgs.49-50 (Count Six—alleging defendants' use of "ASH-GH's 'Grayhawk' and/or 'Grayhawk

---

[1] References to the District Court record follow 11th Cir. Rule 28-5, i.e., Doc.X(Description)-Pg.Y, the Doc. number being the number of the document on the Electronic Case Filing (ECF) system, and the page reference being the page number in the ECF system.

Homes' trademarks"); Doc.71(Sec. Am. Compl.)-Pgs.57-58 (Count Six—

alleging defendants' use of "ASH-GH trademarks"); (Doc.1(Compl.)-

Pgs.50-51 (Count Seven—alleging "unfair competition in violation of

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)"); Doc.71(Sec. Am.

Compl.)-Pgs.58-59 (Count Seven—alleging "unfair competition in

violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)"); Fed.

R. App. P. 28(a)(4)(A); 11th Cir. Rule 28-1(g).

The District Court had supplemental subject-matter jurisdiction

over ASH's state-law claims that arise from the same business dealings

between the same parties. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action

of which the district courts have original jurisdiction, the district courts

shall have supplemental jurisdiction over all other claims that are so

related to claims in the action within such original jurisdiction that they

form part of the same case or controversy …."); Doc.1(Compl.)-Pgs.43-44

(Count One—breach of confidentiality obligations); Doc.71(Sec. Am.

Compl.)-Pgs.50-51 (Count One—breach of confidentiality obligations);

Doc.1(Compl.)-Pgs.44-46 (Count Two—breach of Land Purchase

Agreement); Doc.71(Sec. Am. Compl.)-Pgs.52-53 (Count Two—breach of

Land Purchase Agreement); Doc.1(Compl.)-Pgs.46-47 (Count Three—

breach of Asset Purchase Agreement); Doc.71(Sec. Am. Compl.)-Pgs.53-54 (Count Three—breach of Asset Purchase Agreement); Doc.1(Compl.)-Pgs.47-48 (Count Four—breach of Copyright Assignment Agreement); Doc.71(Sec. Am. Compl.)-Pgs.55-57 (Count Four—breach of Copyright Assignment Agreement); Doc.1(Compl.)-Pgs.52-53 (Count Eight—Georgia trademark infringement); Doc.71(Sec. Am. Compl.)-Pgs.60-61 (Count Eight—Georgia trademark infringement); Doc.1-Pgs.53-54 (Count Nine—Georgia deceptive trade practices); Doc.71(Sec. Am. Compl.)-Pgs.61-63 (Count Nine—Georgia deceptive trade practices); Doc.1(Compl.)-Pgs.55-56 (Count Ten—South Carolina unfair trade practices); Doc.71(Sec. Am. Compl.)-Pgs.63-64 (Count Ten—South Carolina unfair trade practices); Fed. R. App. P. 28(a)(4)(A); 11th Cir. Rule 28-1(g).

This Court has jurisdiction over this appeal from the final decision of the District Court. *See* 28 U.S.C. § 1291 ("The courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States …."). The District Court's decision was final because it, and the preceding orders, disposed of all claims and counterclaims for all parties. *See* Doc.338(FinalJ.); *Sanchez v. Disc. Rock*

& *Sand, Inc.*, 84 F.4th 1283, 1291 (11th Cir. 2023) ("Ordinarily, a final judgment resolves conclusively the substance of all claims, rights, and liabilities of *all parties* to an action.") (internal quotation marks and citation omitted); Fed. R. App. P. 28(a)(4)(B) & (D); 11th Cir. Rule 28-1(g).

The District Court entered its final judgment on September 26, 2023.[2]  On October 24, 2023, ASH timely filed a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), or alternatively, for a new trial under Rule 59(a).[3]  *See* Fed. R. Civ. P. 50(b) (providing for the filing of a renewed motion for judgment as matter of law "[n]o later than 28 days after the entry of judgment …."); Fed. R. Civ. P. 59(b) ("A motion for a new trial must be filed no later than 28 days after the entry of judgment.").  On the same day, defendants Erickson, et al. (collectively, "Erickson"), filed a motion to alter or amend the District Court's order under Fed. R. Civ. P. 59(e).[4]  On January 11, 2024, the District Court denied the parties' post-judgment motions except to reflect an award of

---

[2]*See* Doc.338(Final J.).

[3]Doc.353 (ASH's JML Mot.).

[4]Doc.350(Erickson's Mot. Alter or Amend).

costs to Erickson.[5]   On January 23, 2024, ASH timely filed its notice of appeal.[6]   *See* 28 U.S.C. § 2107(a) ("[N]o appeal shall bring any judgment, order or decree in an action, suit or proceeding of a civil nature before a court of appeals for review unless notice of appeal is filed, within thirty days after the entry of such judgment, order or decree."); Fed. R. App. P. 4(a)(4)(A) ("If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure—and does so within the time allowed by those rules—the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion: (i) for judgment under Rule 50(b); … (v) for a new trial under Rule 59 …."); Fed. R. App. P. 28(a)(4)(C); 11th Cir. Rule 28-1(g).

Erickson filed a notice of cross-appeal on February 8, 2024.[7]

---

[5]Doc.388(Post J. Order)-Pgs.21-22.

[6]Doc. 390(ASH's Not. Appeal).

[7]Doc. 395(Erickson's Not. Cross-Appeal).

# STATEMENT OF THE ISSUE

I.    **Whether the District Court erred in denying ASH's motion for judgment as a matter of law on Erickson's defense that ASH prevented him from agreeing to a Phase C lot development order and/or delivering such lots.**

Under Georgia law, the defense of prevention requires a showing that the first contracting party made the second contracting party's performance under the contract impossible.  Impossibility does not include disappointing negotiations or communications that do not definitively reject performance, but the trial court held otherwise. Erickson, a landowner, agreed to deliver approximately 1,600 lots to ASH to build homes on over eight years.  Both parties had a mutual obligation to agree to the order that about 960 of the lots would be developed (e.g., cleared and leveled).

After disputes arose, both parties initially required all issues to be resolved, not just the order of lot delivery.  But ASH tried repeatedly to resolve the lot development order without resolution of the other disputes.  After filing this lawsuit, ASH filed lis pendens notices of this litigation in the appropriate land records offices.  ASH later granted two of Erickson's requests to remove the lis pendens notice of this litigation

1

on certain parcels of land, but it did not immediately respond to or grant a third request regarding 40 lots made approximately two weeks before trial. ASH never definitively refused to agree to an order for lot development to accept lots or to remove the lis pendens notice on the 40 lots. Did ASH make it impossible for Erickson to agree on a lot development order for all of the lots or to deliver those lots?

## STATEMENT OF THE CASE

### THE NATURE OF THE CASE

This is a contract case. American Southern Homes Holdings, LLC ("ASHH") and ASH-Grayhawk, LLC (collectively, "ASH") purchased (1) the assets of a homebuilding company and (2) an 8-year supply of approximately 1,600 lots to build homes on, from David Erickson and his companies—GH Lot Holdings, Inc. (f/k/a Grayhawk Homes, Inc.), Tiger Creek Development, Inc., Cusseta Road, LLC, Grey Rock Development, LLC, Windsong Bonacre LLC, Erickson Investments, Inc., Sage

Development, Inc., and Carrollton Development, LLC.[8]  For ease of reference, the companies and Erickson are referred to collectively as the "LPA Sellers" or simply as "Erickson."

In exchange, ASH transferred to Erickson a total payment of $24.2 million, comprised of cash, a short-term note that was paid in weeks, and ownership units in ASH.[9]  Of this price, approximately $6.4 million was for the exclusive right to buy 1,600 lots that ASH planned to build houses on and then sell to individual homeowners.[10]  ASH subsequently hired Erickson as its interim CEO, but when ASH did not agree to hire him as permanent CEO, Erickson resigned and almost immediately began to misuse ASH's confidential information on acquisition targets for himself, as the jury found.[11]  Erickson then demanded that ASH buy out his ownership units, which had cost him approximately $8.7 million, for

---

[8] PX246-E.024(LPA-Ex. C-Phase C Lots); Doc.343(Trial Tr.-Twiss)-Pgs.63-65; PX685(Asset Purch. Agr.)-Pgs.6-13; Doc.343(Trial Tr.-Twiss)-Pgs.54-55; Doc.71(Sec. Am. Comp-l.)-Pg.18.

[9] Doc.343(Trial Tr.-Twiss)-Pgs.50-57.

[10] *Id.*

[11] Doc.347(Trial Tr.-Erickson)-Pgs.75, 96; Doc.336(Verdict Form)-Pg.3.

more than $30 million.[12]  Unless ASH acceded to this demand, he would not continue to supply lots[13] and ASH's homebuilding company in Columbus, Georgia would have no lots to build homes on.

ASH responded that it had no contractual duty to buy out Erickson's ownership interests but that Erickson had a contractual duty to supply lots.[14]  The parties negotiated but could not resolve the issues, and ASH filed this lawsuit.  To date, ASH has purchased only 600 lots of the 1,600 it was promised, leaving approximately 960 lots in dispute.[15]  And its homebuilding business in Columbus, Georgia has suffered.[16]

At trial, ASH claimed that Erickson breached the contract under which he agreed to supply approximately 1,600 lots to ASH over an 8-year period (the "Land Purchase Agreement") by not agreeing on the

---

[12]DX312(Feb. 2, 2021 Ltr. from Jake Kramer, ASH's counsel, to Darr Smith, Erickson's counsel regarding proposed resolution of disputes); Doc.347(Trial Tr.-Erickson)-Pgs.48, 208.

[13]*See* DX328 (April 13, 2021 Term Sheet)-Pg.011942; Doc. 344(Trial Tr.-Twiss-Pgs.160; DX333(Ericksons' responsive Term Sheet sent to ASH)-Pg.360048; Doc. 344(Trial Tr.-Twiss)-Pgs.230-232.

[14]DX333(Erickson's Response Term Sheet sent to ASH)-Pg.360053.

[15]Doc.343(Trial Tr.-Twiss)-Pg.61.

[16]Doc.343(TrialTr.-Twiss)-Pg.68.

order in which certain lots (approximately 960 lots) would be developed (e.g., cleared and leveled) as required by the contract, and by not delivering those lots despite the contractual requirement to do so.[17]

<u>Jury Verdict on Breach and Prevention Defense</u>—The jury found Erickson breached the Land Purchase Agreement.[18] But it also found that ASH prevented Erickson from performing his contractual obligations.[19] Erickson argued that ASH prevented his performance by: (1) requiring as part of their negotiations that a settlement apply to all disputes instead of just the order for the development and delivery of the 960 lots; and (2) not responding to a request, right before trial, to lift the lis pendens notice of this litigation with respect to 40 of the 960 lots.[20]

<u>The District Court's Error</u>—The District Court erred in denying ASH's motion for judgment as a matter of law on Erickson's prevention defense.[21] Georgia law provides that prevention occurs only when one

---

[17]Doc.378(Trial Tr.)-Pgs.26-27; Doc.336 (Verdict Form)-Pg.3.

[18]Doc.336 (Verdict Form)-Pg.3.

[19]*Id.*

[20]*See* Doc.378(Trial Tr.-Erickson's Closing Arg.)-Pgs.79-80.

[21]Doc.388(Post-J. Order)-Pgs.1-2.

party makes the other party's performance impossible. ASH's negotiations and not granting one out of three requests to remove lis pendens notices of this litigation covering only 40 of the 960 lots did not make Erickson's performance impossible.

## COURSE OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW

The Operative Complaint and Answer: ASH filed its original complaint on June 14, 2021.[22] ASH filed the operative complaint, its second amended complaint, on January 31, 2022.[23] The second amended complaint contains ten claims that were disposed of as shown in the following chart:

| ASH's Claims | Disposition |
|---|---|
| 1. Breach of confidentiality obligations. (Doc.71(Sec. Am. Compl.)-Pgs.50-51.) | Jury verdict for ASH, nominal damages sought and awarded at $1. (Doc.336 (Verdict Form)-Pgs.1-2.) |
| 2. Breach of Land Purchase Agreement, which also included a request for specific performance of this contract as to the development and sale of the lots. (*Id.* at 51-52.) | Partial summary judgment for ASH that Erickson could not terminate the LPA. (*Id.* at 17.)<br><br>Partial summary judgment for Erickson on obligation to sell above minimum number of lots. (Doc.209(S.J. Order)-Pgs.18-19). |

---

[22]Doc.1(Compl.).

[23]Doc.71(Sec. Am. Compl.).

| ASH's Claims | Disposition |
|---|---|
| | Jury verdict for ASH that Erickson breached beginning on 11/16/2020. (Doc.336 (Verdict Form)-Pg.3.)<br><br>Jury verdict for Erickson on affirmative defense of prevention. (*Id.*) |
| 3.  Breach of non-compete provisions of the Asset Purchase Agreement. (*Id.* at 53-54.) | Summary judgment for Erickson. (Doc.209-Pgs.8-9.) |
| 4.  Breach of Copyright Assignment Agreement. (*Id.* at 55-57.) | Summary judgment for Erickson.  (*Id.* at 24-27.) |
| 5.  Copyright infringement. (*Id.* at 56-57.) | Summary judgment for Erickson.  (*Id.*) |
| 6.  Breach of Trademark Assignment Agreement. (*Id.* at 57-58.) | Pre-verdict JML. (Doc.328-Text Entry.) |
| 7.  Unfair competition in violation of Lanham Act. (*Id.* at 58-59.) | Pre-verdict JML. (*Id.*) |
| 8.  Georgia trademark infringement. (*Id.* at 60-61.) | Pre-verdict JML. (*Id.*) |
| 9.  Violation of Georgia Deceptive Trade Practices Act. (*Id.* at 61-63.) | Pre-verdict JML. (*Id.*) |
| 10. Violation of South Carolina Unfair Trade Practices Act. (*Id.* at 63-64.) | Pre-verdict JML. (*Id.*) |

Erickson's answer to the second amended complaint contained

seven counterclaims that were disposed of as follows:

| Erickson's Counterclaims | | Disposition |
|---|---|---|
| 1. | Declaratory judgment on scope of non-compete agreements. (Doc. 87(Ans. Sec. Am. Compl.)-Pgs.84-86.) | Summary judgment for Erickson on scope and for ASH on enforceability. (Doc.209(Summ. J. Order)-Pgs.8-9.) |
| 2. | Breach of the Warranty Holdback provision of the Asset Purchase Agreement. (*Id.* at 86.) | Summary judgment for Erickson.  (*Id.* at 9-10.)  Damages of $107,642.49 awarded. (Doc.389(Am. Final J.)-Pgs.4-5.) |
| 3. | Breach of the Asset Purchase Agreement regarding the Reeves contract. (*Id.* 87.) | Summary judgment for ASH. (Doc.209(Summ. J. Order)-Pgs.10-14.) |
| 4. | Breach of the Land Purchase Agreement for filing this lawsuit without notice and failing to agree to a development order for the Phase C lots. (*Id.* at 88-90.) | Summary judgment for ASH. (*Id.* at 17 n.3.) |
| 5. | Breach of the Consulting Agreement for terminating with cause and lack of payment. (*Id.* at 90-91.) | Judgment for ASH. (Doc.389(Am. Final J.)-Pg.5.) |
| 6. | Breach of the Transition Services Agreement for failing to indemnify Erickson. (*Id.* at 91-92.) | Dismissed by stipulation. (Doc.209(Summ. J. Order)-Pg.7 n.1.) |

| Erickson's Counterclaims | Disposition |
|---|---|
| 7. Quantum meruit for failure to pay for services rendered in the absence of a valid Transition Services Agreement. (*Id.* at 92-93.) | Judgment for ASH. (Doc.389(Am. Final J.)-Pg.6.) |

<u>Pre-Judgment JML Motions</u>: At the close of the evidence, ASH moved for judgment as a matter of law ("JML") on Count 2—Erickson's breach of the Land Purchase Agreement for failing to deliver lots, Erickson's prevention defense, Erickson's failure to mitigate damages defense, and on Erickson's Counterclaim 5—for ASH's alleged improper termination of the Consulting Agreement for cause.[24]

Erickson moved for JML on ASH's Count 1—breach of the Consulting Agreement.[25]  He also moved for JML on ASH's Count 2—breach of the Land Purchase Agreement, arguing that there was a lack of evidence of lost future profits and that ASH allegedly waited too long to elect the damages remedy.[26]  As background, ASH initially sought specific performance and, in the alternative, damages; but just prior to

---

[24]Doc.378(Trial Tr.-Pre. J. Mot.)-Pgs.10-14.

[25]*Id.* at 9-10.

[26]*Id.* at 8-9.

9

trial, the District Court required ASH to elect between specific performance and damages.[27] Then, Erickson argued that ASH initally elected specific performance and could not change its election to damages when the District Court directed ASH to elect either remedy at the pre-trial conference.[28]  Erickson argued that ASH elected damages too late and thus waived that remedy, contending that ASH had waived the right to seek future lost profits by waiting too long.[29]

The District Court declined to rule on the pre-judgment JML motions, but it stated that it would address post-judgment motions should the parties file them.[30]  The District Court also stated that if the jury found that ASH waived its damages remedy by waiting too long to

---

[27]*Id.*; Doc.287(ASH's Not. Election)-Pgs.1-2.

[28]Doc.378(Trial Tr.-Pre J. Mot.)-Pg.8.

[29]*Id.*

[30]*Id.* at 10, 14.

elect damages, that the District Court would revisit ASH's specific performance remedy.[31]

<u>The Jury's Verdict</u>:  The jury found that Erickson and the other LPA Sellers breached the Land Purchase Agreement (i.e., failure to agree on a Phase C lot development order and/or to deliver Phase C lots) beginning on November 16, 2020.[32]  But the jury also found that ASH had prevented Erickson from performing his obligations under that contract, so there was no award of damages.[33]  The jury thus did not reach Erickson's affirmative defenses of (a) failure to mitigate, or (b) ASH's alleged waiver of the damages remedy.[34]

The jury also found that Erickson breached the Consulting Agreement, which contained the confidentiality provision, and awarded nominal damages of $1 (ASH had sought only nominal damages after confirming in discovery that there was no evidence that Erickson had

---

[31]Doc.347(Trial Tr.)-Pgs.4-5.

[32]Doc.336 (Verdict Form)-Pg.3.

[33]*Id.*

[34]*Id.* at 4.

11

continued misusing ASH's confidential information after being confronted and sued).[35]

The District Court's Final Judgment: The District Court entered judgment on the jury's verdict.[36]  The District Court also entered judgment in ASH's favor on Erickson's Counterclaim 5 for breach of the Consulting Agreement, which the jury rejected, and Counterclaim 7 for quantum meruit for services rendered, which Erickson dropped at trial.[37] Finally, the District Court awarded Erickson $107,642.49 on his breach of the warranty holdback provision of the Asset Purchase Agreement.[38]

The Parties' Post-Judgment Motions: After the judgment, ASH moved for judgment as a matter of law under Fed. R. Civ. P. 50(b) on Erickson's prevention defense and on the two other affirmative defenses to ASH's Count 2 that the jury did not reach (i.e., failure to mitigate damages and waiver by delay in electing the damages remedy), as well as for a new trial on damages for Erickson's breach of the Land Purchase

---

[35]*Id.* at 1-2.

[36]Doc.389(Am. Final J.).

[37]*Id.* at 5-6.

[38]*Id.* at 4-5.

Agreement, and Erickson opposed.[39]  ASH also moved for attorneys' fees related to Erickson's breach of the Consulting Agreement[40] and for a release of the preliminary injunction bond.[41] ASH also moved under Rule 60(b)(3) for return of a $2.5 million deposit that it paid to Erickson under the Land Purchase Agreement to be credited against future lot purchases.[42]

Erickson moved to alter or amend the judgment under Fed. R. Civ. P. 59(e) to require a cancellation of the lis pendens notice and to declare a termination of the Land Purchase Agreement.[43]  He also moved for attorneys' fees for defending the copyright and the trademark claims and for an award of costs under Fed. R. Civ. P. 54.[44]

The District Court's Post-Judgment Rulings: The District Court denied the parties' post-judgment motions, except to award Erickson costs of $34,830.56.[45] The District Court also stated that it took no

---

[39]Docs.353(ASH's JML Mot.); Doc.366(Erickson's Opp. ASH's JML Mot.); Doc.381(ASH's JML Reply).

[40]Doc.355(ASH's Mot. Attys.' Fee).

[41]Doc.364(ASH's Mot. Release of Inj. Bond).

[42]Doc.367(ASH's Mot. Return of Deposit).

[43]Doc.350(Erickson's Mot. Alter or Am.); Docs. 367-1(ASH's Opp. Mot. Alter or Am.); Doc.380(Erickson's Mot. Alter or Am. Reply).

[44]Doc.354(Erickson's Mot. Attys.' Fee).

[45]*See* Doc.388(Post-J. Order)-Pgs.21-22.

13

position on whether ASH could file a future claim for unjust enrichment for Erickson's retention of ASH's $2.5 million development deposit under the Land Purchase Agreement.[46]

The District Court exercised its discretion in denying Erickson's motion for attorneys' fees under the Copyright Act and the Lanham Act, stating:

> Plaintiffs [ASH] presented evidence that they owned valid and enforceable copyrights and that Defendants [Erickson] had access to the copyrighted [house] plans. Furthermore, evidence existed that Defendants used derivatives of the copyrighted plans.  As to the trademark claims, they all survived summary judgment, which presents a substantial hurdle for demonstrating that they were objectively unreasonable.  Simply put, Plaintiffs had a good faith basis for asserting their copyright and trademark claims.  Although the Court ultimately found the evidence presented in support of them to be lacking, the Court does not find this to be an exceptional case where an award of litigation expenses, including attorneys' fees, should be made.[47]

Appeal and Cross-Appeal: The District Court denied the parties' post-judgment motions on January 11, 2024.[48]  ASH filed its notice of

---

[46]*Id. at* 17-18.

[47]Doc.388(Post-J. Order)-Pg.17-18.

[48]*Id.* at 21-22.

appeal on January 23, 2024.[49]  Erickson cross-appealed on February 8, 2024.[50]

## STATEMENT OF THE FACTS

<u>ASH Buys a Homebuilding Business and an 8-Year Supply of Lots on which to Build Homes from Erickson.</u>

American Southern Homes Holdings, LLC ("ASHH") is a holding company that buys and operates homebuilding companies.[51]  Its business model is to invest its capital in the homebuilding companies, not in extensive land positions, such that its homebuilding companies operate "land light."[52]  To do this, ASHH's homebuilding companies needed contracts with landowners and developers to supply a steady stream of lots on which ASHH's homebuilding companies could build homes.[53]  If the stream of lots stops, the homebuilding company is out of business

---

[49]Doc.390(ASH's Not. Appeal).

[50]Doc.395(Erickson's Not. Appeal).

[51]Doc.378(Trial Tr.-Stip. Facts)-Pg. 16-17.

[52]Doc.344(Trial Tr.-Darnold)-Pg. 273.

[53]*Id.* at 273-274.

15

because one cannot build a home without a lot.[54]  ASHH hoped to have profitable homebuilding companies so it could go public one day.[55]

David Erickson was experienced in the homebuilding industry and owned a number of homebuilding companies.[56]  He and his companies also owned significant tracts of land in and around Columbus, Georgia, and Auburn, Alabama.[57]

ASHH and Erickson decided to do a deal.  ASHH paid Erickson $24.2 million for assets transferred to its affiliate ASH-Grayhawk, LLC.[58]  For ease of reference, ASHH and ASH-Grayhawk LLC are referred to collectively as "ASH."  For the $24.2 million, ASH acquired:

1. Right to Buy 1,600 Lots: The exclusive right to buy approximately 1,600 lots over an 8-year time period under the Land Purchase Agreement[59];

---

[54]*Id.* at 293.

[55]*Id.* (Trial Tr.-Twiss) at 112.

[56]Doc.347(Trial Tr.-Erickson)-Pgs.23-20.

[57]*Id.* at 29-34.

[58]Doc.343(Trial Tr.-Twiss)-Pgs.50-59.

[59]PX246-E.024(LPA-Ex. C-Phase C Lots); Doc.343(Trial Tr.-Twiss)-Pgs.62-66.

2. <u>Assets and a Non-Compete</u>: The assets of Erickson's homebuilding companies (e.g., the operating businesses, trademarks, copyrights) under an Asset Purchase Agreement.[60] Erickson also agreed not to engage in a competing homebuilding business in Columbus, Georgia[61]; and

3. <u>Consulting Services and Confidentiality</u>: Erickson's services under a Consulting Agreement and an Employment Agreement that provided Erickson would not use ASH's confidential business acquisition information for his own personal benefit.[62]

<u>$6.4 Million of Purchase Price Paid for Right to Purchase Erickson's 1,600 Lots</u>—Ryan Twiss, the general counsel of ASH, explained that of the $24.2 million purchase price, $6.4 million was a premium paid for "[t]he right to purchase those lots later. An exclusive right."[63] For ASH's

---

[60]PX685(Asset Purch. Agr.)-Pgs.6-13; Doc.343(Trial Tr.-Twiss)-Pgs.54-55.

[61]PX685(Asset Purch. Agr.)-Pgs.47-48.

[62]PX246A(Cons. Agr.)-Pg.4;PX246C(Empl. Agr.)-Pg.5; Doc.343(Trial Tr.-Twiss)-Pgs.117-126.

[63]Doc.343(Trial Tr.-Twiss)-Pgs.50-57.

17

homebuilding business, the right to purchase the 1,600 lots to build homes is "vital": "It's the most important thing we look for."[64] No lots means no homes, no profits, and no going public.

---

[64] *Id.* at 51-52.

**The November 15, 2019 Purchase Transaction**



- Contract to Supply 1,600 Lots over 8 Years *Land Purchase Agreement*

- Homebuilding Company's Assets, *Asset Purchase Agreement*

- Consulting and Confidentiality *Consulting Agreement*

**ASH**

**Erickson**

- $6.4M Premium for Exclusive Right to Buy 1,600 Lots

- $17.8M for the Assets

- $4,000 Monthly Consulting Fee

Total Value Received = $24.2M

ASH paid Erickson the $24.2 million purchase price as follows:

$15.2 million in cash

$ 5.0 million short-term promissory note (paid in just a few weeks after closing)

 $ 4.0 million in ownership units in ASH (Erickson purchased more units later)

Total Purchase Price   $24.2 million[65]

For the consulting services, ASH would pay Erickson a $4,000 per month consulting fee and approved travel expenses.[66]

Land Purchase Agreement—ASH purchased the exclusive right to buy three types of lots from Erickson. The lots in each category were identified by their stage of development at the time the Land Purchase Agreement was signed on November 15, 2019:

- Phase A lots: 158 finished lots ready to build on;

- Phase B lots: 412 lots that could be finished within a year; and

- Phase C lots: 964 lots that needed to be developed (e.g., cleared and leveled) from raw land.[67]

---

[65]*Id.* at 56-57.

[66]*Id.* at 120-121.

[67]*Id.* at 62-63.

20

The Land Purchase Agreement provided that the buyer—ASH—would purchase from the seller—Erickson—"the number of lots set forth on the … Takedown Schedule."[68]    The Takedown Schedule gives a minimum number of Phase A lots, Phase B lots, and Phase C lots to be purchased each quarter from December of 2019 to December of 2027:

---

[68]PX246-E(LPA § 6)-Pgs.3-4; Doc.345(Trial Tr.-Darnold)-Pgs.40-44.

# Takedown Schedule

SCHEDULE 1 TO LPA TAKEDOWN SCHEDULE

| Takedowns | Dec-19 | Mar-20 | Jun-20 | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 |
|---|---|---|---|---|---|---|---|---|---|
| A Lots | 25 | 25 | 25 | 25 | 25 | 25 | 8 | | |
| B Lots | | | | 25 | 30 | 30 | 30 | 30 | 30 |
| C Lots | | | | | | | | 15 | 15 |
| Per Quarter | 25 | 25 | 25 | 50 | 55 | 55 | 38 | 45 | 45 |
| Annual | | | | | 180 | | | | 183 |

| GA | Muscogee | Villages at St. Mary's | | 8 | 12,000 | 15,000 developed | | |
|---|---|---|---|---|---|---|---|---|
| GA | Muscogee | Eagle Pointe II | | 9 | 12,000 | 15,000 developed | | |
| Takedowns | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Mar-23 | Jun-23 | Sep-23 | Dec-23 |
| A Lots | | | | | | | | |
| B Lots | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| C Lots | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Per Quarter | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Annual | | | | 180 | | | | 180 |

| Takedowns | Mar-24 | Jun-24 | Sep-24 | Dec-24 | Mar-25 | Jun-25 | Sep-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|
| A Lots | | | | | | | | |
| B Lots | 30 | 30 | 30 | 27 | | | | |
| C Lots | 15 | 15 | 15 | 18 | 45 | 45 | 45 | 45 |
| Per Quarter | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Annual | | | | 180 | | | | 180 |

| Takedowns | Mar-26 | Jun-26 | Sep-26 | Dec-26 | Mar-27 | Jun-27 | Sep-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|
| A Lots | | | | | | | | |
| B Lots | | | | | | | | |
| C Lots | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Per Quarter | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Annual | | | | 180 | | | | 180 |

| Takedowns | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| A Lots | 125 | 33 | 0 | 0 | 0 | 0 | 0 | 158 |
| B Lots | 55 | 120 | 120 | 117 | 0 | 0 | 0 | 412 |
| C Lots | 0 | 30 | 60 | 63 | 180 | 180 | 180 | 693 |
| Annual | 180 | 183 | 180 | 180 | 180 | 180 | 180 | 1263 |

C LOTS WILL CONTINUE UNTIL ALL LOTS ARE PUCHASED

69

Section 10 of the Land Purchase Agreement provides that the Parties "shall agree to the order in which specific Phase C Lots will be

---

[69] PX246-E.016(LPA-Ex. C-Takedown Sched.); Doc.343(Trial Tr.-Twiss)-Pgs.68-71.

development costs, and a management fee).[73]    But if the price of a lot exceeded 20% of the estimated sales price of the house to be built and sold (the "Estimated Market Value"), ASH did not have to buy the lot.[74] Instead, such a lot would be offered to ASH (a right of first offer— "ROFO") for a certain time period, then it could be offered to a third party on the same or less favorable terms for another time period, and then offered to ASH again.[75]

That was the deal.  And for a while, things went well.


ASH Hires Erickson as Interim CEO.

After the parties signed the deal contracts on November 15, 2019, Erickson began delivering lots.[76]  In 2020, he was ahead of schedule in delivering Phase A lots and Phase B lots.[77]

---

[73]*Id*. at § 11, Pgs.3-4.

[74]*Id*. at §13(b), Pg.4.

[75]*Id*. at §§ 12-13, Pgs.4-5.

[76]Doc.347(Trial Tr.-Erickson)-Pg.96.

[77]*Id*.

24

In October 2020, ASH hired Erickson to be its interim CEO.[78]  To prevent a conflict of interest between Erickson purchasing lots as ASH's CEO while at the same time selling lots as the owner of his companies, ASH created a Land Purchase Committee (the "LPA Committee") that would negotiate as buyer and allow Erickson to negotiate as the seller of the lots.[79]

As interim CEO, Erickson advanced a deal to buy the Dorn homebuilding company in Arizona,[80] and he had access to confidential information on three other homebuilders—Prominence, Miramonte, and Surrey—that ASH was considering acquiring.[81]  But ASH ultimately acquired none of these companies.[82]  As interim CEO, Erickson interviewed Lee Darnold, an experienced homebuilding executive, for a

---

[78]Doc.347(Trial Tr.-Erickson)-Pg.93.

[79]*Id.* at 68-69.

[80]*Id.* at 71.

[81]*Id.* at 147-151.

[82]*Id.*

position with ASH.[83]  ASH had not yet hired Darnold at that time, but it later hired him and made him its CEO.[84]

## Erickson Demands an $18M Bonus, and ASH Does Not Ask Erickson to be Permanent CEO.

But Erickson wanted to be ASH's permanent CEO.[85]  He asked for a compensation package that included a $520,000 salary, an $18.4 million bonus after several years (calculated by assuming 5% of an amount of initial public offering proceeds for all of ASH's ownership interests), and 12 weeks of vacation each year.[86]  On December 16, 2020, ASH declined to make Erickson permanent CEO.[87] Things changed.

## Erickson Resigns and Wants Back in the Homebuilding Business.

Also on December 16, 2020, Erickson agreed that he would stay on as interim CEO for a couple of months.[88]  But four days later on December

---

[83]*Id.* at 154.

[84]*Id.*; Doc.344(Trial Tr.-Darnold)-Pg.251.

[85]Doc.347(Trial Tr.-Erickson)-Pgs.73-74.

[86]Doc.345(Trial Tr.-Erickson)-Pgs.142-145; PX712(Nov. 26, 2020 Email from Erickson to ASH Board Chairman).

[87]Doc.345(Trial Tr.-Erickson)-Pg.147.

[88]Doc.347(Trial Tr.-Erickson)-Pg.75.

20, 2020, he reversed course, sending a letter stating that he resigned immediately and wanted to launch a business much like ASH's business:

> As I have disclosed previously, I have developed ambitions to do more things in the homebuilding and development business with my emphasis being in areas well outside of the Columbus, Georgia market region so as to avoid any competing activities with ASH-Grayhawk.
>
> ....
>
> Specifically, I am intending to purchase one or more homebuilding companies in the near term for my own investments. And if that step should go well, I may consider doing additional purchases in the future.[89]

In a few days, Erickson began misusing ASH's confidential information to advance his new business goals. On December 23, 2020, Erickson entered into a nondisclosure agreement with Prominence, sent a signed nondisclosure agreement to Miramonte, and mailed a nondisclosure agreement to Surrey to consider acquiring those homebuilding companies for himself.[90] Erickson also contacted Darnold.[91]

---

[89]PX199(Dec. 20, 2021 Ltr. from Erickson to Marshall Coleman of ASH); Doc.347(Trial Tr;.-Erickson)-Pgs. 47-79; Doc. 343(Trial Tr.-Twiss)-Pg.116.

[90]Doc. 378(Trial Tr.-Stip. Facts)-Pgs.20-21.

[91]Doc.347(Trial Tr.-Erickson)-Pgs.152-154.

<u>Erickson Demands a Buyout of his Ownership Stake in ASH</u>.

Erickson's relationship with ASH soured significantly.[92]  Erickson demanded that ASH buy his ownership units in ASH.[93]  Erickson's cost of those ownership units (what he received in the purchase transaction plus additional units that he bought) was about $8.7 million.[94]  ASH had no contractual or other obligation to buy out Erickson's ownership interest.[95]  But Erickson had the Phase C lots, and if he did not deliver those lots, ASH would be out of business in Columbus, Georgia and Auburn, Alabama.[96]

---

[92]Doc.344(Trial Tr.-Twiss)-Pgs.29, 48, 58, 235.

[93]DX312(Feb. 2, 2021 Ltr. from Jake Kramer, ASH's counsel, to Darr Smith, Erickson's counsel regarding proposed resolution of disputes)-Pg.1; Doc.347(Trial Tr.-Erickson)-Pgs.207-208.

[94]Doc.347(Trial Tr.-Erickson)-Pg.48.

[95]DX312(Feb. 2, 2021 Ltr. from Jake Kramer, ASH's counsel, to Darr Smith, Erickson's counsel regarding proposed resolution of disputes).

[96]Doc.344(Trial Tr-Twiss)-Pgs.58, 235.

Erickson Wants a $30M Buyout in Exchange for Complying with the
Land Purchase Agreement as to the Phase C Lots.

Meanwhile, the parties were supposed to mutually agree to an
order for the development and delivery of the 960 Phase C lots. [97]  This
agreement was supposed to occur by November 15, 2020.[98]

The parties began a back-and-forth negations process that included
the following:

Fall of 2020—The Parties Ask for Phase C Lot Development
Proposals from Each Other: Before November 15, 2020, Erickson asked
the LPA Committee for an order for developing the Phase C lots, but he
made no proposal and ASH needed information from him to make its own
proposal.[99]  The November 15, 2020 deadline passed without either party
proposing a schedule for development of the Phase C lots.[100]  Both parties
continued to work on the issue, and on November 24, 2020, the LPA
Committee sent a letter to Erickson asking for an update on the Phase C

---

[97]PX246-E.003(LPA § 10); Doc.345(Trial Tr.-Darnold)-Pgs.40-44.

[98]PX246-E(Land Purch. Agr. § 10)-Pg.3.

[99]PX396(Oct. 20, 2020 Email from Erickson to Gary Benson of
ASH); Doc.347(Trial Tr.-Erickson)-Pgs.124-126.

[100]Doc.378(Trial Tr.-Stip. Facts)-Pg.17-18.

lot development order.[101]  Erickson responded that it was "in process" and that he had it "under control," but he never sent a proposal for ASH to consider.[102]

February 2, 2021—ASH seeks a Resolution of the Disputes: Over the Spring of 2021, ASH and Erickson continued to communicate about the Phase C lot development order.[103]  On February 2, 2021, ASH's counsel sent a letter to Erickson's counsel proposing settlement of the parties' disputes, including the Phase C lot development order and Erickson's demand that ASH buy back his ownership interests.[104]

March 5, 2021—ASH Asks for Information to Create its Own Phase C Lot Development Order Proposal: Erickson asked Ryan Twiss, ASH's

---

[101] PX75A(LPA Comm. Ltr. to Erickson)-Pg.1; Doc.347(Trial Tr.-Erickson)-Pg.184.

[102] PX215A(Erickson's Responses to LPA Comm. Ltr.)-Pg.1; Doc.347(Trial Tr.-Erickson)-Pg.184.

[103] PX202.001(March 5, 2021 email from Twiss to Erickson); Doc.344(Trial Tr.-Twiss)-Pgs.48-51.

[104] DX312(Feb. 2, 2021 Ltr. from Jake Kramer, ASH's counsel, to Darr Smith, Erickson's counsel regarding proposed resolution of disputes); Doc.347(Trial Tr.-Erickson)-Pg.208.

general counsel, about the lot development order.[105]    Twiss responded the same day with an email to Erickson, stating: "To move this forward, it would be helpful if your team could provide an updated list of the subdivisions and Phase C lots with current statuses and estimated delivery dates."[106]    This was the information ASH needed to propose an order of Phase C lot development beginning with development work that was already underway.

<u>March 16, 2021—Erickson Provides the Information Necessary to Create a Phase C Lot Development Order</u>: Erickson responded with a chart giving the information for some of the 960 Phase C lots:

---

[105]PX202.001(March 5, 2021 email from Erickson to Ryan Twiss, ASH general counsel); Doc.,344(Trial Tr.)-Pg.49.

[106]*Id*. at 48-51(Twiss); PX202.001(March 5, 2021 email from Twiss to Erickson).

## March 16, 2021-Partial Phase C Lot Information Provided by Erickson

| lot source list | | # lots estimated | typical lot size frontage | Status | Delivery date |
|---|---|---|---|---|---|
| Charleston Place | C list | 40 | 60 foot | In Development / pipes and streets | late spring 2021 with Development agreement |
| North Ivy Park | C list | 19 | 110 foot | In Development / pipes and streets | late spring 2021 with Development agreement |
| Southern Oaks | C list | 57 | 60 foot | Permit approved / pending dev. | Mid summer 2021 with Development agreement |
| Garrett Pines | C list | 60 | 60 foot | engineering planning started | January 2022 with Development agreement |
| Auburn Farms | C list | 42 | 75 foot Single Family | In Development / pipes and streets | late spring 2021 with Development agreement |
| Auburn Farms | C list | 51 | 30 foot townhome lots | In Development / pipes and streets | late spring 2021with Development agreement |
| Smiths Station -5 lots | C list | 5 | 75 foot ???? | Platted, lot clearing, prep pending | late april  2021  with Development agreement |
| Warm Springs Road @ McCagh... | C list | 16 | 28 foot towns | Permit pending, | Fall 2021 with Development agreement |

107

March 18, 2021—ASH Proposes a Phase C Lot Development Order:
Two days later, Twiss responded for ASH, stating: "Using the Excel sheet
you kindly provided, with current development status for a portion of the
Phase C Lots as a starting point, [ASH-]Grayhawk proposes the
development order as attached hereto in Exhibit A (the 'Development
Order')." Exhibit A is a spreadsheet that provides the following proposed
development order for the remaining Phase C lots (in the first column),
based initially on the development work Erickson had already done
without a development order:

---

107PX200B.001-.002(Attachment to March 16, 2021 email (PX200)
from Erickson to Ryan Twiss); Doc.344(Trial Tr. Twiss)-Pgs.51-53.
PX200B shows a single spreadsheet page printed on two pages.  Those
pages are aligned as a single page above for ease of reading.

# March 18, 2021-ASH's Proposed Phase C Development Order

| Development Order | Neighborhood | lot source list | # lots estimated | typical lot size frontage | Status | Delivery date |
|---|---|---|---|---|---|---|
| 1 | Smiths Station -5 lots | C list | 5 | 75 foot ???? | Platted, lot clearing, prep pending | late april 2021 with Development agreement |
| 2 | Charleston Place | C list | 40 | 60 foot | In Development / pipes and streets | late spring 2021 with Development agreement |
| | North Ivy Park | C list | 19 | 110 foot | In Development / pipes and streets | late spring 2021 with Development agreement |
| | Auburn Farms | C list | 42 | 75 foot Single Family | In Development / pipes and streets | late spring 2021 with Development agreement |
| | Auburn Farms | C list | 51 | 30 foot townhome lots | In Development / pipes and streets | late spring 2021with Development agreement |
| 3 | Southern Oaks | C list | 57 | 60 foot | Permit approved / pending dev. | Mid summer 2021 with Development agreement |
| 4 | Warm Springs Road @ McCagh... | C list | 16 | 28 foot towns | Permit pending, | Fall 2021 with Development agreement |
| 5 | Garrett Pines | C list | 60 | 60 foot | engineering planning started | January 2022 with Development agreement |
| 6 | Charleston Place | C list | 22 | | | |
| | North Ivy Park | C list | 31 | | | |
| | Southern Oaks | C list | 54 | | | |
| | Garrett Pines | C list | 36 | | | |
| 7 | Lexington Hills | C list | 29 | Need to confirm basis with DE - $58,000 basis | | |
| | Beech North/Park West | C list | 80 | Need to discuss phasing | | |
| | Hodges Drive | C list | 12 | | | |
| 8 | Auburn Farms | C list | 215 | Need to discuss phasing | | |
| | Belvedere Park | C list | 123 | Need to discuss phasing | | |
| | McKee Road | C list | 80 | Need to discuss phasing | | |
| 9 | Buena Vist Road | C list | 30 | | | |
| | Upland Way Group | C list | 40 | | | |

[108]

Ryan Twiss's cover letter stated: "[D]ue to the broad nature and scope of the ongoing Global Resolution, I believe it makes sense to limit the scope of our discussion to the Development Order, at least for now."[109]  In the March to April 2021 time frame, Erickson did not respond to the above proposed schedule for the development of the Phase C lots.[110]  In

---

[108]PX197B(ASH's Prop. Dev. Order); Doc. 344(Trial Tr.-Twiss)-Pgs.54-56.

[109] PX197A(March 18, 2021 Ltr. from Twiss, general counsel of ASH, to Erickson).

[110]Doc. 344(Trial Tr.-Twiss)-Pgs.55-56.

2023, at trial, Erickson characterized the above proposal, which was based on information he provided, as "useless."[111]

April 8, 2021—ASH Sends Erickson a Draft Complaint: With negotiations stalling and the September 2021 delivery date for the first Phase C lots approaching, ASH sent Erickson's counsel a draft complaint listing a number of claims relating to the parties' contracts (e.g., breach of the Land Purchase Agreement for not agreeing to a Phase C lot development order, breach of the Consulting Agreement by using ASH's confidential information, breach of the Asset Purchase Agreement's non-compete provision, breach of contract, and trademark and copyright claims for use of the Grayhawk name and house plans that Erickson had sold to ASH).[112]

April 13, 2021—ASH Offers to Keep Original Price Formula or Change to a New Formula for Phase C Lots: With land prices and house prices accelerating, Erickson wanted more certainty.[113]  In its April 13,

---

[111]Doc.347(Trial Tr.-Erickson-Pg.s.197-198.

[112]DX326 (April 8, 2021-Draft Compl.)-Pgs.48-60; Doc.344 (Trial Tr.-Twiss)-Pgs.155-159.

[113]Doc.344(Trial Tr.-Twiss)-Pgs.185-186.

2021 Term Sheet, ASH offered to either (a) stick with the original Land Purchase Agreement pricing, which did not require ASH to purchase Phase C lots if the lot price exceeded 20% of the estimated value of the lot and house together, or (b) guarantee its purchase of all the Phase C lots at 17.5% of the estimated market value of the ultimate sales price of the house and the lot (over 3% higher than Erickson received the prior year). At trial, Erickson asserted that ASH was trying to change the price in the Land Purchase Agreement,[114] but ASH's written offer stated in black-and-white that ASH would either stick with the original pricing in the Land Purchase Agreement or change it—at Erickson's option:

### ASH's April 11, 2021 Offer to Keep Old Price Formula or Adopt a New One

- Lot Pricing:

  - o  <u>Option 1.</u> Pricing based on LPA formula, <u>with</u> standard ROFO process.

  - o  <u>Option 2.</u> All such Phase C lots to be priced at 17.5% of Estimated Market Value (as defined in the LPA) (average in 2020 was 14.24%), with a true-up based on actual sales price. This would end the ROFO process.

[115]

---

[114] *See* Doc.347(Trial Tr.-Erickson)-Pgs.105-106.

[115] DX328(April 11, 2021 Term Sheet)-Pg.011942.

Despite having no obligation to do so, ASH also offered to discuss Erickson's demand that ASH buy back his ASH ownership units.[116]

May 6, 2021—ASH Again States it will Settle Phase C Lot Development Order Without Settlement of Other Claims: The Term Sheets that the parties exchanged included boilerplate language: "Nothing is agreed until everything is agreed, including the terms of a settlement agreement and execution of such agreement."[117] While the parties exchanged draft Term Sheets, they typed in comments, including some as "NTD" (i.e., Note to Draft).[118]  On May 6, 2021, Erickson's counsel sent a responsive Term Sheet to ASH's counsel, that included ASH's NTD, stating that it will agree to resolve the Phase C lot development order separately from all the other issues, and included Erickson's response:

---

[116]*Id.* at DX011944.

[117]See DX328(April 13, 2021 Term Sheet)-Pg.011942; DX333(Ericksons' responsive Term Sheet sent to ASH)-Pg.360048; Doc. 344(Trial Tr.-Twiss)-Pgs.231-232.

[118]DX333(Erickson's Responsive Term Sheet sent to ASH)-Pg.360050; Doc. 344(Trial Tr.-Twiss)-Pgs.231-232.

## ASH Offers to Settle Phase C Lot Development Order Separately

[2]      ASH NTD: LPA creates two-way obligation to agree on development order, which is not (and should not be) contingent on agreement to other terms, including LPA changes. ASH requests a response to its March 18 proposal.

   Erickson NTD: Erickson is willing to provide a response as the negotiations progress, but does not plan to reach an interim agreement on schedule without an agreement on other points.  As ASH has stated repeatedly, nothing is agreed until everything is agreed.

[119]

The Term Sheet provided that the parties would agree to a Phase C Lot development order, and Erickson had typed in "Agreed in principle subject to resolution of other points."[120]   The key other point was the buyout of his ownership interest.  ASH's counsel's stated in the Term Sheet that ASH could not agree on price without knowing what basis Erickson had for demanding ASH purchase his ownership interests and by Erickson's counsel's response that "none of the deal points addressed in this term sheet are agreed until the terms of the buyout are agreed":

---

[119]*Id.*

[120]*Id.*

ASH's Comment

B. At this point, however, ASH is not in a position to agree on a price per unit, because it does not know (1) what threatened claims it would be settling to avoid litigation (despite our many requests) and/or (2) what ASH would receive in return for a buy-out that is has no obligation to undertake.

As Erickson has previously explained, separation is in the best interests of all parties. That process can and should be forward looking. Valuation, not claims, is the relevant issue. And none of the deal points addressed in this term sheet are agreed until the terms of the buyout are agreed.

121

Erickson's Comment

As is spelled out in black-and-white, it was Erickson, not ASH, who made agreement on a Phase C development order contingent on meeting his other demands. Indeed, Erickson testified that he was open to agreeing to a Phase C lot development order only if ASH dropped all of its other claims (i.e., if there was a global resolution of all disputes).[122]

The development status information that Erickson sent to Ryan Twiss of ASH on March 16, 2021, showed that several subdivisions were in advanced stages of development and were just a few months away from

---

[121]DX333(Erickson's Responsive Term Sheet sent to ASH)-Pg.360053.

[122]Doc.378(Trial Tr.-Erickson)-Pg.158.

38

being finished.[123]  Confirming this, Erickson testified that he could have finished hundreds of Phase C lots within three months.[124]  While local governments would have to cooperate,[125] there is no evidence that a local government failed to do so when asked.  Instead of developing the lots for sale to ASH, Erickson placed them in "dormant" status and stopped working on them.[126]

<u>June 1, 2021—Erickson Demands $30 Million for his ASH Ownership Stake</u>: Erickson's counsel sent ASH a proposed Term Sheet to resolve the issues, seeking $30,501,940[127] for Erickson's stake in ASH and stating: "Nothing is agreed until everything is agreed, including terms of a settlement agreement with mutual general release of claims."[128]  The $30M was based on a proposal to go public that never

---

[123]PX200B.001(Attachment to March 16, 2021 email(PX200) from Erickson to Ryan Twiss).

[124]*Id*. at 239.

[125]*Id*.

[126]*Id*. at 237.

[127]Doc.344(Trial Tr.-Twiss)-Pg.238.

[128]*Id*.

materialized and was not possible given the deterioration of ASH's financial position caused by a lack of lots on which to build houses.[129]

There was no agreement as to the Phase C lot development order.

June 2, 2021—Erickson Walks Out of Settlement Meeting When ASH Won't Agree to Pay $30 Million for His Ownership Stake: The parties met at Erickson's lawyers' office in Washington, D.C.[130]  When ASH would not negotiate the $30 million demand to buy Erickson's ownership units in ASH, Erickson walked out.[131]  Nonetheless, ASH thought Erickson had agreed in principle to ASH's March 18, 2021 proposed development order.[132]

After the meeting ended, but still on June 2, 2021, ASH sent Erickson another Term Sheet.[133]  ASH offered to take over the development of most of the Phase C lots for Erickson.[134]

---

[129]Doc.344(Trial Tr.-Twiss)-Pgs.236-238.

[130]*Id.* at 142.

[131]*Id.* at 239.

[132]*Id.* at 56-59; PX467(ASH's Default Notice to Erickson)-Pg.1.

[133]DX344(June 2, 2021 Term Sheet from ASH to Erickson)-Pg.088320; Doc.344(Trial Tr.-Twiss)-Pg.243-244.

[134]*Id.*

But Erickson would not implement ASH's Phase C lot development proposal, and he later denied the agreement in principle.[135]  Although Erickson said at the 2023 trial that he would be willing to sell the Phase C lots to ASH under the original Land Purchase Agreement price, that was only if ASH dropped all of its claims.[136]  Erickson never agreed to any development order for the Phase C lots and never proposed one to ASH.[137]  Instead, he tied his compliance with the Land Purchase Agreement to his $30 million demand to be bought out.

June 14, 2021—When Erickson Won't Extend the Standstill Agreement, ASH Files this Lawsuit: The parties had entered into a standstill agreement to allow them to negotiate without filing a lawsuit.[138]  After the June 2, 2021 meeting, ASH asked Erickson to extend the standstill agreement.[139]  He refused and invited ASH to sue him.[140]  On June 14, 2021, ASH filed this lawsuit, alleging that Erickson

---

[135]*Id.* at 59.

[136]Doc.347(TrialTr.-Erickson)-Pg.156.

[137]*Id.* at 217.

[138]Doc.344(Trail Tr.-Twiss)-Pgs.245-246.

[139]*Id.* at 245.

[140]*Id.*

had breached the Land Purchase Agreement by not agreeing to a Phase C lot development order and not delivering lots.[141]

June 21, 2021—The parties Exchange Default Notices, but do not Terminate the Land Purchase Agreement: Erickson sent a notice of default under the Land Purchase Agreement, and ASH responded with its own notice of default, stating that Erickson had failed to set a Phase C lot development order.[142]  Erickson did not respond, let alone cure his default during a 15-day cure period.   Erickson then attempted to terminate the Land Purchase Agreement after ASH's 45-day cure period expired, but the District Court found that the agreement was not effectively terminated, including because ASH had cured any alleged default.[143]

---

[141]Doc.1(Compl.)

[142]PX698(June 21, 2021 Ltr. from Erickson's counsel to ASH's counsel Re: Notice of Default); Doc.347(Trial Tr.-Erickson)-Pgs. 211-212; PX467(June 21, 2021 Ltr. from ASH's counsel to Erickson's counsel,  Re: Notice of Default); Doc.344(Trial Tr.-Twiss)-Pg.58.

[143]Doc.209(Summ. J. Order)-Pgs.16-17.

September 2021—Erickson delivers 15 Lots: By the end of the third quarter of 2021, Erickson delivered a total of 15 Phase C lots to ASH per the Takedown Schedule.[144]

December 2021: Erickson Attempts to Terminate the Land Purchase Agreement—When ASH requested delivery of the next 15 Phase C lots per the Takedown Schedule in December 2021, Erickson responded stating: "The Land Purchase Agreement is terminated and Mr. Erickson's obligations thereunder are extinguished. Accordingly, Mr. Erickson will not deliver any further lots to ASH-Grayhawk."[145] (The District Court later held that the Land Purchase Agreement had not been effectively terminated as the undisputed facts showed no uncured default by ASH.[146] In any event, Erickson did not voluntarily deliver any more Phase C lots as required by the Land Purchase Agreement.

---

[144]Doc.344(Trial Tr.-Twiss)-Pg.30.

[145]Doc.344(Trial Tr.-Twiss Test.)-Pgs.34-35; PX840B (Dec. 17, 2021 Ltr. from Quackenboss, counsel to Erickson, letter to Jacob Kramer, counsel to Erickson)-Pg.1.

[146]Doc.108(Prel. Inj. Order)-Pgs.7-10; Doc.209(Summ. J. Order)-Pgs.16-17.  Erickson did not challenge this ruling in its JML motions. See Doc.378(Trial Tr.)-Pgs.7-10; Doc.351(Erickson's Rule 59(e) Motion to Alter or Amend J.)-Pgs.1-7.

<u>May 2022—Erickson Enjoined to Deliver More Phase C Lots</u>: On April 29, 2022, the District Court ordered Erickson to deliver more Phase C lots to ASH.[147]   Erickson generally complied with the preliminary injunction and delivered 27 Phase C lots to ASH.[148]   After delivering a total of 42 Phase C lots out of 960 (15 by September 2021 and 27 in May 2022), Erickson never delivered another Phase C lot to ASH.[149]

---

[147]Doc.108(Prel. Inj. Order)-Pg.18.

[148]Doc.344(Trial Tr.-Twiss)-Pg.247.

[149]*Id.* at 33.

44



**Timeline of Phase C Lot Deliveries**

ASH's Business Suffers After Not Obtaining the Phase C Lots:

When the flow of Phase C lots dried up, the number of homes ASH was building plummeted.[150]    ASH had to lay off employees.[151]    It lost the tradesmen who had been working on its homes.[152]    And ASH cannot go

---

[150]Doc.343(Trial Tr.-Twiss)-Pg.68.

[151]*Id.*

[152]*Id.*

public.[153] To date, ASH has received about 600 of the total of 1,600 lots—38%—for which it paid a premium of $6.4 million.[154]

September 2023—Erickson's Pre-Trial Lis Pendens Request: After filing this lawsuit about the lots Erickson contracted to sell to ASH, ASH placed a notice of the litigation, called a lis pendens, in the public land records in the Columbus, Georgia and Auburn, Alabama areas.[155]  In August 2021, Erickson asked ASH to remove the lis pendens notice on a piece of property in the Carrollton area, and ASH did.[156]  In  October 2021, Erickson asked ASH to remove the lis pendens notice on a piece of property Erickson wanted to give to the Georgia Department of Transportation for a right-of-way, and ASH did.[157]

But two to three weeks before trial in 2023, Erickson's counsel sent a request to ASH to remove the lis pendens notice on 40 lots in the Charleston Place subdivision in Columbus, Georgia.[158]  In the midst of

---

[153]Doc.344(Trial Tr.-Twiss)-Pg.238.

[154]Doc.343(Trial Tr.-Twiss)-Pg.61.

[155](Doc.347(Trial Tr;.-Erickson)-Pg.135.

[156]*Id.* at 218.

[157]*Id.* at 220.

[158]Doc.347(Trial Tr.)-Pg.18.

46

trial preparation, ASH did not immediately respond or grant this request.[159]  Erickson then argued at trial that ASH had prevented him (and the other LPA sellers) from delivering the Phase C lots.[160]

STANDARD OF REVIEW

"[This Court] review[s] de novo the denial of a motion for judgment as a matter of law." *Highland Consulting Group, Inc. v. Minjares*, 74 F.4th 1352, 1358 n.2 (11th Cir. 2023) (citation omitted).

## SUMMARY OF ARGUMENT

The jury correctly found that Erickson breached the Land Purchase Agreement by not agreeing to a Phase C lot development order and/or by not delivering Phase C lots. The District Court erred in denying ASH's motion for JML on Erickson's prevention defense because negotiation and not immediately granting one out of three requests to remove lis pendens notices on 40 lots in August to September of 2023 did not make

---

[159]*Id*. at 135

[160]*Id*. at 218.

47

Erickson's performance under the Land Purchase Agreement impossible in 2021, 2022, and for 2023.

For the prevention affirmative defense to apply, ASH must have made Erickson's performance under the contract "impossible." Negotiating and not granting one out of three requests to remove a lis pendens notice does not constitute impossibility as a matter of law.

In the negotiations, ASH identified potential claims against Erickson for breaching a number of contracts and asked him to perform his obligations under the Land Purchase Agreement, i.e., to agree to a Phase C lot development order and to deliver lots. Erickson leveraged his ability to turn off the supply of lots, — a violation of the Land Purchase Agreement – to get something no contract provided for—a $30 million buy-out of his ownership stake in ASH.

That is how the negotiations happened, as shown in black-and-white by a series of written settlement communications.

ASH offered in writing to negotiate the Phase C lot development order separately from the other disputes. ASH never definitively stated that it would not agree to a Phase C lot development order or would not accept Phase C lots.

48

And ASH never definitively stated that it would not remove the lis pendens on any of the 960 Phase C lots.  Instead, Erickson admitted that ASH had granted two prior requests to remove the lis pendens notices with respect to transfers to third parties.  Nothing about the lis pendens notices stopped these transfers.  For the rest of 2022 through made two to three weeks before trial in September of 2023, Erickson made no request to lift any lis pendens or to transfer any lots to ASH.  But right before trial in September of 2023, his counsel sends a request to remove the lis pendens on 40 out of 960 Phase C lots (i.e., 4.2% of the lots).  ASH's lack of response or not granting that late 2023 request did not stop Erickson from delivering lots in 2021, 2022, or up through the request two to three weeks before trial in September of 2023.  And even after the request was made, it did not apply to the other 920 Phase C lots.  This pre-trial, 4.2% request did not make performance impossible.

ASH preserved its JML arguments based on the record as a whole. ASH made a pre-trial JML motion that stated the relief sought.  ASH filed in a proposed jury instruction stating, citing, and quoting Georgia's law on prevention and impossibility of performance.  And ASH elicited evidence from Erickson on negotiations and lis pendens the trial day

49

immediately preceding its pre-judgment JML motion. The District Judge and Erickson's counsel knew ASH's response to Erickson's belated prevention arguments.

This Court should reverse the District Court's denial of ASH's JML motion and remand for a new trial on damages.

## ARGUMENT

**I.    The District Court Erred In Denying ASH's JML Motion On The Prevention Defense Because Negotiations And A Lis Pendens Notice That This Lawsuit Existed Did Not Make It Impossible for Erickson To Perform Under The Land Purchase Agreement.**

The Land Purchase Agreement required the parties to reach an agreement on the order for developing over 960 Phase C lots and for Erickson and the other LPA Sellers to deliver those lots to ASH over a 7-year time period (i.e., 2021 to 2027).[161] The undisputed evidence showed that Erickson never agreed to an order for Phase C lot development proposed by ASH and never proposed a development order himself.[162] The jury found that Erickson breached the Land Purchase Agreement:

---

[161]PX246E(LPA)-Pgs.2-3.

[162]*See* Doc.347(Trial Tr.-Erickson)-Pg.217 ("Q. By this point, July 12, 2021, you had never proposed an order of Phase C lot development

5.  Do you find that American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC proved by a preponderance of the evidence that the LPA Sellers breached the Land Purchase Agreement and caused damages to American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC?

Answer Yes or No     <u>yes</u>

If you answered "Yes," state the date that the breach first occurred:    <u>11/16/2020</u>

[163]

ASH sought $48 million in damages.[164]

To avoid liability for his breach of the Land Purchase Agreement, Erickson argued that ASH prevented him from agreeing to a Phase C lot development order in two ways.  First, Erickson argued that during the parties' pre-suit settlement negotiations, ASH communicated settlement offers that made any agreement to a Phase C lot development order contingent on agreeing to settle the other claims.[165] Second, Erickson

---

that was so important to you, right?  A.  That's correct.  Q. And despite the importance of this issue to you, you have even responded to Mr. Twiss's March 18 proposal, right?  A. Correct.").

[163]Doc.336(Verdict Form)-Pg.3.

[164]Doc.378(Trial Tr.-Erickson's Closing Arg.)-Pg.56.

[165] Doc.378(Trial Tr.)-Pgs.79.

51

argued that ASH did not respond or grant its request to lift the lis pendens notice of this lawsuit on 40 of the Phase C lots.[166]

The jury found that ASH prevented the LPA Sellers from agreeing to a Phase C lot development order as required by the Land Purchase Agreement:

6. Do you find that the LPA Sellers proved by a preponderance of the evidence that American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC prevented the LPA Sellers from performing their obligations under of the Land Purchase Agreement?

Answer Yes or No     <u>yes</u>

[167]

The finding of prevention meant ASH could collect nothing for Erickson's breach of the Land Purchase Agreement for which ASH paid $6.4 million.[168]  ASH moved for judgment as a matter of law on the LPA Seller's prevention defense,[169] the District Court deferred ruling on the

---

[166]*Id*. at 80.

[167]Doc.336(Verdict Form)-Pg.3.

[168]Doc.343(Trial Tr.-AHS's Closing Arg.)-Pgs.56.

[169]Doc.378(Trial Tr.)-Pgs.12-13.

motion until after the jury's verdict,[170] ASH filed a timely post-judgment JML motion,[171] and the District Court denied it.[172]  This affected ASH's "substantial right" to collect damages.  *See* Fed. R. Civ. P. 61 (requiring error to affect a "party's substantial rights" for a court to set aside or modify a verdict).  The denial was error as a matter of law.

## A.    To Prevent One Party from Performing a Contract, Georgia Law Requires that the Other Party Make Performance "Impossible."

Georgia law provides: "If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance."  Ga. Code Ann. § 13-4-23.  This Court has followed the Georgia courts' interpretation of Georgia Code § 13-4-23 to require the first party to a contract to show that the conduct of the second party made the first party's performance "useless or impossible," instead of merely difficult or contentious.    *See J & E Builders, Inc. v. R C Dev., Inc.,* 646 S.E.2d 299, 301 (Ga. Ct. App. 2007) ("[T]he party bound to perform [an] obligation may be relieved and the

---

[170]*Id*. at 13.

[171]Doc.353-1(ASH's JML Mot. Br.)-Pgs.6,8-19.

[172]Doc.388(Order Denying JML)-Pgs.1-2, 21.

obligation waived[] where the other party to the contract repudiates the obligation by act or word, or takes a position which renders performance of the obligation useless or impossible."); *CRS Sirrine, Inc. v. Dravo Corp.*, 464 S.E.2d 897, 900 (Ga. Ct. App. 1995) ("[T]he general principle expressed in OCGA § 13–4–23: If a party to a contract makes it impossible for the other party to perform, the other party's nonperformance is excused."). Neither party argued that a lot is useless for building a house on, so this argument focuses on impossibility.

In *Rourk v. Bank of American National Association*, 587 Fed. Appx. 597, 598 (11th Cir. 2014), this Court affirmed Judge Land (the District Judge in this case) in a case involving the prevention defense where a homeowner failed to make her mortgage payments and the bank foreclosed. She sought to excuse her default under Ga. Code Ann. § 13-4-23 by pointing to the bank's faliure to properly apply payments she made during bankruptcy, rejecting post-bankruptcy payments, and sending "conflicting reinstatement letters." *Id*. This Court concluded that under § 13-4-23 a "party's performance must have been rendered 'useless or *impossible*' in order to be excused." *Id*. at 598-99 (quoting *Ott v. Vineville Mkt. Ltd.*, 416 S.E. 2d 362, 363 (Ga. Ct. App. 1992), and citing

*L.D.F. Family Farm, Inc. v. Charterbank,* 756 S.E.2d 593, 598 (Ga. Ct. App. 2014), and *Moody Nat'l RI Atlanta H, LLC v. RLJ III Fin. Atlanta, LLC,* No. 1:09–cv–3676–WSD, 2010 WL 163296 (N.D.Ga. Jan. 14, 2010)) (emphasis added). This Court held that the homeowner's nonpayment breach was not prevented by the bank's breaches because the bank fixed the breaches and the bank never definitively said it would not accept payments from her:

> [Homeowner] Rourk's nonperformance cannot be excused by the bank's alleged breaches in the past. First, the bank cured any potential breach caused by mishandling Rourk's account during her bankruptcy or in rejecting her post-bankruptcy payments when it made her account current as of April 2010, effective August 16, 2010. Second, the **bank never indicated definitively that it would not accept Rourk's payments**, even if they were less than what she actually owed. The sole reason it had rejected previous payments was because they were not made with certified funds, not because they were partial payments.

*Id.* at 599 (emphasis added). The homeowner in *Rourk* did not show that it was impossible for her to perform her contractual obligations. Nor did Erickson, here.

**B.    ASH's Settlement Negotiations and Lis Pendens Notice Did Not Make Erickson's Agreement to a Phase C Lot Development Order and/or Delivery Lots Impossible.**

**1.    <u>Negotiations</u>: ASH's Seeking an Agreement with Erickson on All Disputed Claims Did Not Make Erickson's Performance "Impossible."**

As in *Rourk*, ASH's negotiating to settle the parties' disputes did not make it "impossible" to agree on an order in which Erickson would develop the Phase C lots and deliver them to ASH.  First, Erickson had hundreds of Phase C lots that were within three months of being developed, until he put them in "dormant" status.[173]  Second, Erickson was able to develop and deliver 42 Phase C lots without a development order.[174]  Third, ASH repeatedly tried to get Erickson to propose a lot develpoment order, but he never did so, nor would he agree to ASH's proposed order.[175]

Fourth, the District Court summarized Erickson's position as follows: he did not think ASH's assertion of number of claims was in "good

---

[173]Doc.345(Trial Tr.-Erickson)-Pg.239.

[174]Doc.344(Trial Tr.-Twiss)-Pg.33.

[175] Doc.347(Trial Tr.-Erickson)-Pgs.1220, 1233-1234, 1241.)

faith."[176]    But performance was not actually impossible simply because
the offering Term Sheets included language that said:

> "Nothing is agreed until everything is agreed, including the
> terms of a settlement agreement and execution of such
> agreement."[177]

Otherwise, Erickson could have cherry-picked the parts he felt were
favorable and agreed to them, but not agreed to the others.  And requring
negotiations to be finalized in a written agreement is not uncommon.  *See,
e.g.*, *Sparks v. Sunshine Mills, Inc.*, 580 Fed.Appx. 759, 762 (11th Cir.
2014) ("Plaintiff understands that this settlement, if approved, is a
compromise of all claims which Plaintiff may now have or may have in
the future as a result of this injury …."); *Huntington v. Fishman*, 441
S.E.2d 444, 447 (Ga. Ct. App. 1994) ("The Warshauer settlement purports
to settle 'any and all claims, known and unknown, relating to the subject
incident.'").

For example, in *Moody*, 2010 WL 163296, at *1, cited by this Court
in *Rourk*, 587 Fed. Appx. at 599, owners of a hotel who had defaulted on

---

[176]Doc.344(Trial Tr.)-Pgs.178-179 (admitting evidence of offers and
counteroffers via Term Sheets) (emphasis added).

[177]PX201A(March 12, 2021 Term Sheet)(unredacted), Doc.
347(Trial Tr.)-Pg.103-104.

their loan payments engaged in negotiations with their lender on how to work out the default, and they got an indication that substantial default interest would be waived if an overall modification agreement could be reached. The lender premised the negotiations with the statement that "acceptance, now … by Lender of any full or partial payments . . . shall not be deemed to constitute: (i)  an agreement amending, modifying or qualifying in any respect the terms and provisions of the Loan Documents …." *Id*.  Instead, the lender required that "the Loan Documents are and shall remain in full force and effect and unmodified, unless and until amended or modified by (and only to the extent provided in) a definitive written agreement executed by the parties …." *Id*.  In other words, the lender would not agree on the separate term of a payment reduction until everything was agreed in a new, written agreement.

When a new lender took over and demanded full payment, the owners delayed a monthly payment, thus breaching the loan agreements. *Moody*, 2010 WL 163296 at *9.  They argued that their delay should be excused because they did not know if the new lender would apply the payment as a regular payment or against the default interest, were "shell shocked" by the full payment demand, and thought the new lender "did

58

not exercise good faith." *Id.* The district court held: "Assuming [the owners'] fear that [the new lender] would apply a December payment to default interest charges was well-founded, [the owners] cannot claim [the new lender's] conduct caused nonperformance." *Id.* "Plaintiffs took a calculated risk by not making a timely payment, knowing that doing so was a breach of the Note, which explicitly provided for default remedies." *Id.*

Likewise, Erickson's purported shock at ASH's claims (Erickson called them the "extortion claims"),[178] and the insinuation of ASH's possible lack of good faith in wanting to settle all the claims in a written agreement, did not make it impossible for him either to agree to ASH's proposed Phase C lot development order or to propose his own.  As did the borrowers in *Moody*, 2010 WL 163296 at *9, Erickson refused to agree to an order or to deliver lots as a bargaining tactic to get a $30 million buyout.  Erickson "took a calculated risk by [not agreeing to a Phase C lot development order], knowing that doing so was a breach of the [Land Purchase Agreement], which explicitly provided for default remedies

---

[178]Doc.347(Trial Tr.-Erickson)-Pg.108.

[e.g., notice, cure, and sue for breach]." *See Moody*, 2010 WL 163296 at *9.

Moreover, ASH had repeatedly tried to obtain a Phase C lot development order and lots from Erickson because ASH's homebuilding business needed a supply of lots to stay in business. But Erickson never once proposed one.[179] ASH sent a proposed Phase C lot development order to Erickson on March 18, 2021, indicating that the parties should address the order separately from other disputes, but he would not agree to it.[180]

Nevertheless, in the May 6, 2021 Term Sheet, ASH again offered to settle the Phase C lot development order separately:

> ASH NTD [Note to Draft]: LPA creates a two-way obligation to agree on development order, which is not (and should not be) contingent on agreement to other terms, including LPA changes. ASH requests a response to its March 18 proposal.[181]

---

[179]Doc.347(Trial Tr.-Erickson)-Pg.178 ("Q. Right. And I think you testified, I think, that you have never once proposed an order of Phase C lots development yourself, right? A. That would be a correct statement.").

[180]Doc.344(Trial Tr.-Twiss Test.)-Pgs.53-56; PX197B.

[181]DX333(March 6, 2021 Term Sheet)-Pg.3 n.2; Doc. 344(Trial Tr.)-Pgs.375-376.

But Erickson refused to do so, stating in another Note to Draft, "As ASH has stated repeatedly, nothing is agreed until everything is agreed."[182] ASH never definitively stated that it would not agree to a development order or accept Phase C lots. To the contrary, because its business depended on lots, ASH worked hard to obtain an agreement on the development order, later obtained a preliminary injunction to force Erickson to deliver 27 lots, and it tried everything it could to negotiate Erickson into selling ASH the lots he had agreed to sell.

Requiring an agreement on all issues in some of ASH's offers did not make it impossible for Erickson to agree to a Phase C lot development order, nor did it make his delivery of lots to ASH impossible.

2.    **Lis Pendens: ASH's Failure to Respond to Erickson's Eve-of-Trial Request to Lift the Lis Pendens on 40 Phase C Lots did Not make Erickson's Performance "Impossible."**

Next, Erickson argued that ASH's lack of response to one of three of his requests to lift the lis pendens notice on 40 Phase C lots prevented

---

[182]Doc.344(Trial Tr.-Twiss)-Pg.232.

him from agreeing to a development order for the Phase C lots.[183]  After refusing to propose or to agree to a Phase C lot development order for almost three years, and resisting a preliminary injunction requiring him to sell lots to ASH, Erickson's counsel made this request to lift the lis pendens on 40 of the 960 Phase C lots—a mere two to three weeks before trial began.[184]  When ASH did not immediately respond to this eve-of-trial proposal, Erickson argued to the jury that ASH's failure to lift the lis pendens prevented him from giving those 40 lots to the City of Columbus, and his breach of contract should be excused.[185]

A lis pendens does not legally bar a transfer of land, but simply notifies potential third party purchasers of a lawsuit related to that land.[186]  *See Hutson v. Young*, 564 S.E.2d 780, 782 (Ga. Ct. App. 2002); *Lankford v. Milhollin*, 48 S.E.2d 729, 730 (Ga. 1948).  "[A] lis pendens simply gives notice to prospective purchasers that a lawsuit involving the realty has been filed. It does not prevent the sale of the property, nor is

---

[183]PX246-E (LPA-Ex.C Phase C Lots)-Pg.25; Doc.347(Trial Tr.-Erickson)-Pgs.134-135.

[184]Doc.347(Trial Tr.-Erickson) at Pg.220.

[185]*Id.* at 134-135.

[186] Doc.353-1(ASH's JML Mot.)-Pg.18.

it a lien on the property." *Aiken v. Citizens & Southern Bank of Cobb County*, 291 S.E. 2d 717, 719 (Ga. 1982); *Dime Sav. Bank of New York, FSB v. Sandy Springs Assoc., Inc.*, 405 S.E.2d 491 (Ga. 1991) (same); *accord Batson v. Etheridge*, 195 So. 873 (Ala. 1940) (purpose of lis pendens is to provide notice of pending litigation relating to land and does not prevent sale).

After ASH filed this lawsuit in June of 2021, ASH filed lis pendens notices in the appropriate land offices where the lots were located in Georgia and Alabama.[187] Of course, ASH and Erickson already had notice of the lawsuit to which they were the parties.[188] So the lis pendens notice might have raised a question on a proposed sale to a third party, but not to ASH whose interest the notice protects.[189] Erickson testified that he had to have clear title (i.e., without a lis pendens notice) to transfer common areas of the property to the City of Columbus.[190] His

---

[187]*Id.* at 217.

[188]*See* Doc.1(Compl.).

[189]Doc. 353-1(ASH's JML Mot. Br.)-Pgs.18-19.

[190]Doc.347(Trial Test.-Erickson)-Pg.134.

counsel said that was needed for the City to maintain public roads and sewer lines for a subdivision.[191]

Erickson, however, admitted on cross-examination that ASH had removed the lis pendens both previous times Erickson asked ASH to do so. Erickson asked ASH to lift the lis pendens on the Carrollton parcel in 2021 and later on a right-of-way for the Georgia Department of Transportation and ASH did so on both occasions.[192] And ASH's non-removal of the lis pendens in the Fall of 2023 did not affect in any way Erickson's ability to deliver Phase C lots in 2021, or 2022, and for most of 2023. Erickson, who bore the burden of proving his affirmative defense,[193] did not testify that ASH had stated definitively that it would never lift the lis pendens notice on the 40 lots or any other Phase C lots.[194]

---

[191]Doc.378(Trial Tr.-Erickson)-Pg.80.

[192]Doc.347(Trial Tr.-Erickson)-Pgs.218-220.

[193]Doc.378(Trial Tr.-Jury Instr.)-Pg.110, 125 (providing that the LPA Sellers (i.e., Erickson and his companies) bore the burden of proof on the prevention affirmative defense); Doc.336(Verdict Form)-Pg.3 (same). *See Ott v. Vineville Mkt., Ltd.*, 416 S.E.2d 362, 364 (Ga. App. 1992) ("[Lessor accused of preventing performance by tenant] would not bear the burden of proof on this issue at trial, it was not required to disprove this contention affirmatively.").

[194]Doc.353-1(ASH's JML Mot. Br.)-Pgs.18-19;Doc.381(ASH's JML Mot. Reply)-Pg.11

64

Similarly, in *Rourk*, 587 Fed. Appx. at 599, "the *bank never indicated definitively that it would not accept Rourk's payments*, even if they were less than what she actually owed." (emphasis added).  And, in *L.D.F. Family Farm, Inc. v. Charterbank*, 756 S.E.2d 593, 598 (Ga. Ct. App. 2014), there was no impossibility in repaying a loan when the bank officer's statement about extending the loan was not definitive.   In 2008, L.D.F. Family Farm ("LDF") borrowed money to purchase and develop a subdivision. *Id.* at 595.  When the economy faltered, the lending bank went into receivership and assigned the loan to Charterbank.  *Id.*  LDF defaulted, entered a forbearance agreement, and defaulted again.  *Id.* The Charterbank bank officer told LDF the bank would "work with" LDF and "we may have to extend this forbearance agreement," but, in the end, Charterbank foreclosed on the property.  *Id.* at 598. The Georgia Court of Appeals emphasized that "[t]he purported statement was not definitive …." *Id.*   With that record, the court held that performance was not "impossible." *Id.*

Likewise, ASH's conduct in granting Erickson's request to remove the lis pendens notice two times and then not immediately responding to or not granting the last request two or three weeks before trial did not

amount to a "definitive statement" that ASH would not remove that lis pendens notice, too.    From executing the Land Purchase Agreement through the negotiations with Erickson to filing this lawsuit, ASH's purpose was to obtain a 7-year supply of Phase C lots from Erickson on which to build homes.  The purpose of the lis pendens notice was to notify third parties of the existence of this lawsuit between ASH and Erickson, in order to secure the lots for ASH, not to prevent the lots from delivery to ASH.   Under this record, there is "no way" ASH "prevented him [Erickson]" from performing under the Land Purchase Agreement.[195]

Moreover, while Erickson noted that the lis pendens notice applies to all Phase C lots, he did not testify that ASH's non-removal of the notice as to 40 lots applied to any other of the 960 Phase C lots.  The 40 lots in the Charleston Place subdivision are shown in the list of 964 Phase C lots attached to the Land Purchase Agreement:

---

[195]Doc. 378(Trial Tr.-Pre-J. Mot.)-Pg. 13.

**Exhibit C-Phase C Lots**

40 Charleston Place lots that Erickson testified about

EXHIBT C - FUTURE ROFO LOTS

|  | State | County | Subdivision | Current Basis | Estimated lots | Basis per Lot | Apx acres | $ per acre | Status | Related Party Owned By |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | 7,808,128 |  | 124,250 |  |  |  |  |
| 1 | GA | Muscogee | Beach/North/Parkwest | 225,119 | 80 | 2,814 | 24 | 9,241 | Undeveloped | Tiger Creek Dev. |
| 2 | GA | Muscogee | Belvedere Park | 411,124 | 123 | 3,359 | 36 | 11,561 | Undeveloped | Tiger Creek Dev. |
| 3 | GA | Muscogee | Buena Vista Road | 17,397 | 30 | 580 | 11 | 1,611 | Undeveloped | Tiger Creek Dev. |
| 4 | GA | Muscogee | Charleston Place | 1,199,473 | 62 | 19,346 | N/A | N/A | Undeveloped | Tiger Creek Dev. |
| 5 | GA | Muscogee | McKee Road | 1,470,653 | 80 | 18,383 | 143 | 10,284 | Undeveloped | D. Erickson |
| 6 | GA | Muscogee | Garrett Pines | 279,504 | 96 | 2,912 | 43 | 6,464 | Undeveloped | Tiger Creek Dev. |
| 7 | GA | Muscogee | Lexington Hills | 1,690,739 | 29 | 58,301 | N/A | N/A | undeveloped | Cussets Road LLC |
| 8 | GA | Muscogee | North Ivy Park | 315,650 | 50 | 6,313 | N/A | N/A | Undeveloped | Grey Rock Dev. LLC |
| 9 | AL | Lee | Auburn Farms | 1,861,799 | 308 | 6,045 | 148 | 12,548 | Undeveloped | Tiger Creek Dev. |
| 10 | AL | Lee | Southern Oaks | 334,669 | 54 | 6,198 | N/A | N/A | Undeveloped | Tiger Creek Dev. |
| 11 | GA | Muscogee | Hodges Drive | 45,000 | 12 | 3,750 | 2 acres townhomes |  | Undeveloped | Windsong Bon, LLC |
| 12 | GA | Muscogee | Upland Way Group/7pcs | 111,000 | 40 | 3,750 |  |  | Undeveloped | Erickson Inv. Inc. |
|  |  |  |  | 7,964,128 | 964 |  |  |  |  |  |

As of 10/11/19

[196]

In *Ott*, 416 S.E.2d at 363, cited by this Court in *Rourk*, 587 Fed. Appx. at 599, the Georgia Court of Appeals held that partial interference with performance of a contract did not rise to the level of making performance impossible.    In *Ott*, 416 S.E.2d at 363, a tenant at a shopping mall leased space to a business named "A Flower Cart."  When the lessee defaulted on the lease, the shopping mall owner sued for unpaid rent.  *See Ott*, 416 S.E.2d at 363. The lessee asserted that it was prevented from paying rent under Ga. Code Ann. § 13-4-23 because the landlord breached the lease by renting to other tenants that competed with A Flower Cart.  *See id.*  The Georgia Court of Appeals held that the

---

[196]PX246-E.024(LPA-Ex. C-Phase C Lots); Doc.343(Trial Tr.-Twiss)-Pgs.63-65.

prevention defense would not apply: "Although nearby competition seemingly could hamper a business' profitability, Ott's [the lessee's] evidence failed to create a credible issue of fact on whether this competition made A Flower Cart's operation *impossible* or useless." *Id.* at 364 (emphasis added). Partial inteference does not render performance impossible.

Likewise, ASH did not immediately respond to/or grant Erickson's request to remove the lis pendens notice from 40 out of over 960 lots (i.e., 4.2%) after ASH had previously removed the notice on two other parcels. This, at best, might amount to partial interference, but as a matter of Georgia law did not render Erickson's performance impossible.

Under Georgia law, impossibility means a party really cannot perform its obligations under the contract. *See, e.g.*, *Allen v. Harkness Stone Co., Inc.*, 609 S.E.2d 647, 650 (Ga. Ct. App. Ct. 2004) (holding that lessee's breach was excused where landlord forced lessee out of business); *Raburn Bonding Co. v. State*, 535 S.E.2d 763, 765–66 (Ga. Ct. App. 2000) (bail bondsman could not produce defendant to court because defendant left the country for military service); *Roberson v. Eichholz*, 462 S.E.2d 382, 384 (Ga. Ct. App. 1995) (lawyer could not perform legal services after client removed him from case); *Weathercraft Co. v. Byrd*, 123 S.E. 180,

68

181 (Ga. Ct. App. 1924) (syllabus) (subcontractor could not complete work when architect in charge of project forbade him from continuing to work). Negotiating to settle the case and not responding to one out of three requests to remove a lis pendens notice did not prevent Erickson from agreeing to a Phase C lot development order or delivering the lots.

Erickson's prevention defense fails as a matter of Georgia law. This Court should reverse the District Court's denial of ASH's motion for judgment as a matter of law and remand for a new trial on damages.

### C. ASH Preserved its JML Arguments on Prevention Because the District Court and Erickson were Aware of those Arguments when ASH made them in its Pre-Trial JML Motion.

Erickson argued below that ASH waived the JML remedy on his prevention affirmative defense by not arguing it sufficiently in ASH's pre-judgment motion for JML.[197]  This argument fails because the record before the District Court at the time ASH made its pre-judgment JML motion at the close of all the evidence notified the District Court and Erickson of ASH's arguments and the law and facts supporting them.

---

[197]Doc.366(Erickson's Opp. to ASH's JML Mot.)-Pgs.9-10.

ASH made a Rule 50(a) motion after the close of the evidence.[198] Once made, Rule 50(a)(2), Fed. R. Civ. P. provides: "The motion must specify the *judgment sought* and the *law* and *facts* that entitle the movant to the judgment." (Emphases added.)   This Court has liberally interpreted Rule 50(a)'s requirement that a pre-judgment JML motion specify the judgment sought and the law and facts that support it.   In *Insurance Company of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1300 (11th Cir. 2012), this Court explained that "where the trial court and all parties actually are aware of the grounds upon which the motion is made, strict enforcement of the specificity requirement in Rule 50(a)(2) is unnecessary":

> Federal Rule of Civil Procedure 50(a)(2) provides that, when making a motion for judgment as a matter of law, the movant must "specify the judgment sought and the law and facts that entitle [it] to the judgment." **The purpose of this rule is to provide notice to the court and the opposing party** of any deficiencies in the plaintiff's case. *Rankin v. Evans*, 133 F.3d 1425, 1432–33 (11th Cir. 1998). But "**where the trial court and all parties actually are aware of the grounds** upon which the motion is made, **strict enforcement** of the

---

[198]Doc. 378(Trial Tr.)-Pgs.10-13. Rule 50 contemplates that an oral motion will suffice for pre-judgment motion for JML.  *Compare* Fed. R. Civ. P.50(a)(2) ("A motion for judgment as a matter of law may be *made* ….") (emphasis added), *with id.* at (b) ("the movant may *file* a renewed motion for judgment as a matter of law ….") (emphasis added).

specificity requirement in Rule 50(a)(2) **is unnecessary** to serve the purpose of the rule." Id. at 1433; see *Etienne v. Inter–Cnty Sec. Corp.*, 173 F.3d 1372, 1374 (11th Cir. 1999).

*Ins. Co. of the West*, 679 F.3d at 1300 (emphases added).

The Judgment Sought: ASH specified the judgment sought in its oral Rule 50 motion at the close of all the evidence. When the District Court asked if "Plaintiffs have Rule 50 motions," ASH's counsel responded, "Yes, Your Honor."[199]  *See* Fed. R. Civ. P. 50(a) (providing for a motion for judgment as a matter of law). ASH's counsel made clear the judgment that was sought: "We move for judgment as a matter of law on Count Two [breach of the Land Purchase Agreement]," which included the affirmative defense of prevention.[200]

The Law: ASH's legal arguments opposing Erickson's prevention defense were clear on the record as a whole. In its oral motion, ASH stated the argument was about "prevention": "But because there's no way that we[ASH] could've prevented him[Erickson], there's no evidence that we prevented him from delivering those lots at that time, the Court

---

[199]Doc.378(Trial Tr.)-Pg.10.

[200]*Id*. at 12-13.

71

should grant judgment as a matter of law that they [Erickson/the LPA Sellers] breached the LPA [Land Purchase] Agreement."[201]

ASH had also filed into the record the following requested jury instruction that a party's non-performance of a contract is excused if the other party makes that performance "impossible," quoting the applicable Georgia statute and case law supporting that proposition:

---

**PLAINTIFFS' PROPOSED JURY INSTRUCTION NO. #19**
**Contracts – Impossibility of Performance[1]**

A party to a contract is relieved from its obligation under the contract if the other party to the contract repudiates the obligation, by act or word, or takes a position which renders performance of the obligation useless or impossible.

---

[1] *See* O.C.G.A. § 13-4-23 (where one party's non-performance is caused by the opposite party, such conduct excuses the party's performance); *J & E Builders, Inc. v. R C Dev., Inc.*, 646 S.E.2d 299, 301 (Ga. Ct. App. 2007) ("[T]he party bound to perform [an] obligation may be relieved and the obligation waived[] where the other party to the contract repudiates the obligation by act or word, or takes a position which renders performance of the obligation useless or impossible.").

---

[202] *See Quinn v. Southwest Wood Prods., Inc.,* 597 F.2d 1018, 1027 (5th Cir. 1979) ("There can be no doubt that the trial judge was well aware of the reasons for the **requested jury instruction**, and, under the

---

[201]*Id.* at 13.

[202]Doc.226(ASH's Prop. Jury Instr.)-Pg.32.

72

circumstances, we hold that this constitutes a sufficient predicate for the subsequent motion for judgment notwithstanding the verdict.") (emphasis added).

The Facts: The factual basis for ASH's argument against Erickson's prevention defense was self-evident to the parties and the District Court based on the context and timing of the evidence and the arguments.  In *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1379-80 (Fed. Cir. 2009), the court reasoned that a Rule 50(a) motion was sufficiently specific, stating: "The motion in this case was made *shortly after* an extended *discussion of the evidence* relating to anticipation and obviousness, and it is clear from the context that neither the court nor [the plaintiff's] attorneys needed any more enlightenment about [the defendant's] position on those issues." *Id.* (emphases added).

As in *Blackboard, Inc.*, 574 F.3d at 1379-80, ASH's JML motion[203] in this case was made shortly after ASH's cross-examination of

---

[203]Doc.379(Trial Tr.)-Pgs.10-13.

Erickson[204]—the next trial day—and included the testimony directly responding to Erickson's prevention arguments.

When Erickson's counsel elicited testimony from Erickson at trial on his prevention defense—negotiations with a global resolution requirement and refusal to remove lis pendens—ASH's cross-examination of Erickson countered both factual arguments:

| ASH's Cross-Examination of Erickson on Prevention |
|---|
| **Negotiations** |
| • "Q. That's right. And the ASH note says: LPA creates a two-way obligation to agree on development order, which is not, and should not, be contingent on agreement to other terms, including LPA changes. ASH requests a response to its March 18 proposal."[205] |
| • "Well, why don't you read your response? Can you read it out loud to the jury, please?<br><br>"A. Erickson NTD. Erickson is willing to provide a response to the negotiations as the negotiations progress, but does not plan to reach an interim agreement on schedule without an agreement on other points. As ASH has stated repeatedly, nothing is agreed until everything is agreed."<br><br>"Q. So you made it contingent, didn't you? |

---

[204]Doc.347(Trial Tr.-Erickson)-Pgs.205-206.

[205]*Id.* at 205.

| ASH's Cross-Examination of Erickson on Prevention |
|---|
| "A. No I just decided you had a good plan, so we will just stick with it."[206] |
| **Lis Pendens** |
| <ul><li>"Q. Isn't it true that in August 2021 ASH agreed to remove the lis pendens at your request for a piece of property owned by Carrollton Development?<br><br>"A. I believe that's accurate."[207]</li><li>"Q. Okay. ASH released a notice of lis pendens in October of 2021 relating to a right of way for the Georgia Department of Transportation, right?<br><br>"A. That sounds correct."[208]</li></ul> |

Aware of the record as a whole, the District Court was not surprised and did not find waiver. Instead, the District Court summarily denied both parties' JML motions on the grounds that "the jury verdict is supported by the evidence in the record and is not contrary to law."[209]

---

[206]*Id.* at 206.

[207]*Id.* at 218.

[208]*Id.* at 220.

[209]Doc.388(Post. J. Order)-Pgs.1-2.

The purpose of requiring notice with a Rule 50(a) motion is "to avoid making a trap of the motion" for an unaware non-movant or surprise to the District Court. *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010) (citation omitted); *Ins. Co. of the West*, 679 F.3d at 1300. Erickson did not list prevention of performance as an affirmative defense in his answer[210] it is not in the pretrial order,[211] and it was not in his proposed jury instructions.[212]  Instead, Erickson sent the request to remove a lis pendens notice to ASH two to three weeks before trial, raised his legally deficient prevention defense for the first time at trial, and successfully opposed admission of pre-trial correspondence as being too late in time.[213]  Erickson then argued at closing that the negotiations and lis pendens issues constitute prevention.[214]  Erickson was not entrapped, but was fully aware of the law and the facts on this issue.  Requiring further specificity here would not serve Rule 50(a)(2)'s purpose.

---

[210]Doc.87(Ans. To Sec. Am. Compl.)-Pgs.47-53.

[211]Doc.294(Pre-Trial Order).

[212]Doc.223(Erickson's Prop. Jury Instr.).

[213]Doc.347(Trial Tr.)-Pgs.218-219.

[214]Doc.378(Trial Tr.-Erickson's Closing Arg.)-Pgs.79-80.

Moreover, where the arguments in the post-judgment Rule 50(b) motion are not copies of the Rule 50(a) arguments, but closely related to the arguments in the pre-judgment Rule 50(a) motion, the purpose of the rule to give notice is accomplished. *See Ross v. Rhodes Furn., Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998) ("If the grounds argued in a motion under Rule 50(a) are **'closely related'** to those argued in a Rule 50(b) motion, then "setting aside a jury's verdict is not surprise to the non-movant.") (emphasis added); *Nat'l Indus., Inc.*, 781 F.2d at 1549 (holding that pre-judgment JML on future profits issue plus a "requested [] jury instruction on damages that listed lost profits for 1982 and 1983, and separately, loss of goodwill" were sufficient because "[a]lthough loss of future profits and loss of goodwill and reputation may be legally distinct, the two are also **closely related** ….") (emphasis added). Considering the record as a whole, ASH's arguments in its pre-judgment Rule 50(a) motion are closely related to the arguments in its post-judgment Rule 50(b) motion—prevention, impossibility, negotiations, and lis pendens.[215]

---

[215]*See* Doc.353-1(ASH's JML Mot. Br.)-8-18(negotiations); *id.* at 18-19 (lis pendens); Doc.366(Erickson's Opp. ASH's JML Mot.)-Pgs.10-14; Doc.381(ASH's JML Reply)-Pgs.7-11.

ASH preserved its JML arguments and those arguments require reversal and remand for a new trial on damages.


## CONCLUSION[216]

If a non-breaching party's efforts to negotiate a global settlement of litigation over a contract with the other party could be used by the breaching party to establish "prevention" of its performance, then there would no longer be an incentive for settlement discussions in any such cases. Similarly, if a plaintiff in litigation involving real property could no longer avail itself of the laws of the jurisdiction regarding lis pendens notices to third parties because the defendant would turn around and use that to establish a "prevention" defense, then there would be no effective recourse against breaching parties who could sell the real estate to bonafide purchasers for value without notice of the litigation. That the result in both instances is so clearly against public policy and common sense is why the authorities discussed above reject them.

---

[216]ASH incorporates every argument and citation of law and the record for each argument made in this Brief to every other argument in this Brief.

This Court should reverse the District Court's denial of ASH's motion for JML on Erickson's prevention defense, and remand for new trial on the amount of damages.

Respectfully submitted on this the 3rd day of April, 2024.

/s/ Ed R. Haden

Ed R. Haden
*Counsel for Plaintiffs–Appellants American Southern Home Holdings, LLC and ASH-Grayhawk, LLC*

79

## CERTIFICATE OF COMPLIANCE

As required by Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I certify as follows:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief contains 12,299 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

In addition, this brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure. This brief has been prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

Respectfully submitted this the 3rd day of April, 2024.

*/s/ Ed R. Haden*
Ed R. Haden
*Counsel for Plaintiff-Appellants American Southern Home Holdings, LLC and ASH-Grayhawk, LLC*

80